Argued on the merits March 23, reversed April 26, rehearing denied May 31, 1921.

## STONE *v.* FIRST NATIONAL BANK.

(193 Pac. 1023; 197 Pac. 304; 198 Pac. 244.)

**Appeal and Error—Affidavit Showed Excusable Mistake in Failing to File Undertaking so as to Authorize New Undertaking.**

1. Affidavit of attorney for appellant, excusing failure to serve and file undertaking on appeal on October 4th, as required by Section 550, subdivision 2, Or. L., *held* to have shown such excusable mistake and good faith in prosecuting the appeal as to justify the Supreme Court in permitting appellant to file undertaking in the Supreme Court pursuant to subdivision 4.

### ON THE MERITS.

**Election of Remedies—Complaint in Action Against Third Person not Considered as Election When not Referred to in Answer.**

2. Where there is no reference in the answer to the complaint filed by plaintiff in an action against a third party, the legal effect of the pleadings in the one case cannot be considered with reference to the other, or treated as an election of remedies.

**Evidence—Complaint Against Third Person Held to be Considered as Showing History of Transaction and Party's Understanding of Contract.**

3. In a suit on a contract for the sale of logs previously sold to a third party by a contract canceled by mutual consent, though the

execution of the earlier contract and what was done under it, or its terms and conditions, or the reasons why it was canceled, were not pleaded as a defense, and there was no reference in the answer to the complaint filed by plaintiff in an action against the third person, such complaint could be considered for the purpose of showing the history of the transaction, the relation of the parties, and the reasons why the contract in suit was executed and how it was understood and construed by plaintiff.

**Liens—Contract for Sale of Logs Providing for Assignment of Invoices as Security Held not to Give Equitable Lien.**

4.  A contract for the sale of logs previously sold to the C. Company by a contract canceled by mutual consent, which provided that the buyer would execute and deliver acceptances for the price of each raft of logs and, to secure further payment of the acceptances, would assign to a bank with which the seller intended discounting the acceptances its invoices against its customers for lumber manufactured from the logs, gave the seller no equitable lien on the logs or unsold lumber for the purchase price of the logs, where no invoices were made or assigned, especially where the seller, as security for the price, took the C. Company's promise to pay if the buyer did not pay.

### ON REHEARING.

**Liens—Contract for Sale of Logs Held not to Give an Equitable Lien—"Invoice."**

5.  A contract for the sale of logs which stipulated that the seller expected to discount the buyer's acceptances with a bank, wherein the buyer agreed that, in order further to secure payment of the acceptances, it would assign to the bank or such other person as the seller might direct the invoices of the buyer against its customers for the lumber manufactured from the logs, did not give an equitable lien in favor of the seller of the logs after transfer of their possession to the buyer, an "invoice" being merely a written account of the particulars of merchandise shipped or sent to a purchaser, consignee, or factor, with the value or prices and charges annexed; merely another term for bill rendered.

**Equity—Lien Held not Created by Maxim as to Regarding as Done That Which Ought to be Done.**

6.  The maxim as to regarding that as done which ought to be done means that which the parties agreed to do, and have not done, and cannot be invoked to create an equitable lien on property sold by contract passing title, and not evidencing intent to hold it as security.

From Tillamook: GEORGE R. BAGLEY, Judge.

In Banc.

Motion to dismiss appeal.              DENIED.

---

5.  By whom and for what labor or service a logger's lien may be claimed, see note in **Ann. Cas.** 1916C, 198.

*Mr. S. S. Johnson* and *Messrs. Bauer, Greene &
McCurtain,* for the motion.

*Messrs. Botts & Winslow, contra.*

McBRIDE, C. J.—1. This is a motion to dismiss an
appeal. The undertaking was not served and filed
until twelve days after the notice of appeal had been
served and filed. Section 550, subdivision 2, Or. L.,
requires the undertaking to be filed within ten days
from the service of notice of appeal. Subdivision 4
of the same section is as follows:

"From the expiration of the time allowed to except
to the sureties in the undertaking, or from the justifi-
cation thereof if excepted to, the appeal shall be
deemed perfected. When a party in good faith gives
due notice as hereinabove provided of an appeal from
a judgment, order, or decree, and thereafter omits,
through mistake, to do any other act (including the
filing of an undertaking as provided in this section)
necessary to perfect the appeal or to stay proceed-
ings, the court or judge thereof, or the appellate
court, may permit an amendment or performance of
such act on such terms as may be just."

One of the attorneys for appellant filed an affidavit,
the substance of which is that the tenth day after the
service of the notice of appeal fell upon Sunday,
October 3, 1920, upon which day it was impossible to
serve and file the undertaking; that on October 4th
the Circuit Court was in session and affiant and his
partner were very busy disposing of matters arising
in court that day; that they had been very busy in
preparing cases for trial at term for several days
previously; that affiant was under the impression that
he had ample time to serve and file the undertaking
but that when he discovered late in the afternoon
that October 4th was the last day in which to file it,

he prepared the undertaking and had it executed, but was not able to procure the attendance of his client and surety to execute it until late in the evening, after office hours; that he was unable to find Mr. Johnson, the attorney for the First National Bank of Tillamook, at his office at Tillamook, where both he and affiant resided; that he at once made service upon the other defendants, but was unable to serve the First National Bank or its attorney, Mr. Johnson, until the next day, when he made such service early in the morning; that the failure to serve the undertaking on October 4th was by reason of the oversight, inadvertence and mistake on the part of affiant as above stated; and that appellant has printed his abstract, prepared and filed his transcript and is intending to prosecute his appeal with diligence. We are of the opinion that the affidavit shows such excusable mistake and such good faith in prosecuting the appeal as justify us in permitting the appellant to file a new undertaking here.

The early cases cited by counsel held that the filing of the undertaking within ten days after service of the notice of appeal was jurisdictional, and a failure so to file was absolutely cause for dismissal. In our original Code the words, "including the filing of an undertaking as provided in this section," did not appear; they were added by way of amendment at the legislative session of 1870, Laws of 1870, page 32; and their purpose was evidently to correct the harsh ruling of the cases decided before that time. In *Dowell* v. *Bolt,* 45 Or. 89 (75 Pac. 714), we held that filing of an undertaking was not jurisdictional, and permitted a new undertaking to be filed where the original paper had not been served on the adverse party. This ruling is followed in *Mitchell* v. *Coach,* 83 Or. 45

(153 Pac. 478, 162 Pac. 1058), and *McKissick* v. *McKissick,* 93 Or. 644 (174 Pac. 721, 184 Pac. 272).

In *Miller* v. *Arenz,* 193 Pac. 439, in an opinion handed down November 23, 1920, and not yet officially reported, we held that where there was an entire failure to file an undertaking within ten days, the default could be excused upon showing of excusable mistake, so that this court must be understood now as holding that doctrine. *Fleming* v. *Pattison,* 72 Or. 393 (143 Pac. 1101), appears to hold differently, but in that case there was no proffer of a new undertaking. So far as it appears to hold that the service and filing of an undertaking within ten days after service of notice of appeal are absolutely jurisdictional, it is overruled.

The motion is overruled, upon the condition that appellant file in this court within fifteen days a new and sufficient undertaking.    MOTION OVERRULED.

---

Reversed April 26, 1921.

ON THE MERITS.

(197 Pac. 304.)

On the merits.                                            REVERSED.

Department 2.

BURNETT, C. J.—On March 11, 1919, the plaintiff entered into a written contract with the Cummings-Moberly Company, a corporation, which was then constructing a sawmill on Tillamook Bay, to furnish it a quantity of logs and piling at an agreed price of $12 per thousand. The price was "f. o. b. raft at slough tributary to Wilson River, at McKinster's place, in Tillamook County, Oregon, payments to be made for each raft within thirty days from the time raft is scaled." Under the terms of the contract, Stone assembled and had ready for delivery about 1,182,431 feet of spruce logs. The company, having changed its

plans, did not want the logs and notified him of that fact and to cease operations under his contract. As a result of negotiations between all parties, on September 5, 1919, it was finally arranged that the Silver Spruce Company, another corporation, should take the assembled logs from Stone at the same price, under the following agreement:

"Tillamook, Ore., Sept. 5, 1919.

"This agreement this day made by and between Charles F. Stone of Tillamook, Oregon, and Silver Spruce Company, a corporation, of which J. K. Elder is President, hereinafter referred to as the company, WITNESSETH:

"Stone hereby sells to the Company, and the Company hereby buys from Stone, all those certain Spruce logs gotten out by Stone under his contract dated March 11th, 1919, with the Cummings-Moberly Company (said Contract having been cancelled by mutual consent); said logs comprising, according to the official certificates of the Columbia River Log Scaling and Grading Bureau one thousand, five hundred and twenty-seven (1,527) logs, with a total footage of one million, one hundred and eighty-two thousand, four hundred thirty one feet (1,182,431). The price of said logs under this sale is $12.00 per thousand feet.

"Said logs are now at Freeman slough, on the Wilson River, Tillamook County. They are to be rafted by Stone and as rafted are to be again scaled by Columbia River Log Scaling and Grading Bureau. As each raft is completed and scaled, the logs therein shall become the property and at the risk of the Company, and the Company agrees that, immediately upon the delivery to it of the certificate of the Columbia River Log Scaling and Grading Bureau showing the number of feet included in a raft, the Company will promptly execute and deliver to Stone the Company's acceptance for the price of the logs included in such raft at the rate of twelve dollars ($12.00) per thousand feet.

"It is understood that Stone expects to discount said acceptance with the First National Bank of Tilla-

mook, and the Company agrees that in order to further secure payment of said acceptance (which shall mature ninety days after their respective dates) the Company will assign to the First National Bank of Tillamook, or such other person as Stone may direct, the invoices of the Company against its customers for the lumber manufactured from said logs.

"The charges of the Columbia River Log Scaling and Grading Bureau for scaling said logs to be divided equally between the parties.

"SILVER SPRUCE Co.,

"By J. K. ELDER, Pres.

"C. F. STONE."

Concurrent therewith, and on the same day, the Cummings-Moberly Company at Tillamook, Oregon, addressed a letter to the plaintiff at that place, the material portions of which are as follows:

"This confirms our understanding that the contract between us dated March 11th, 1919, is cancelled on the following terms:

"We are to pay you within the next three days the sum of $3899.99 in cash.

"You are selling with our consent to Silver Spruce Company the logs covered by our agreement with you, and we have agreed that if said Company fails to carry out its agreement with you to take and pay for said logs, that we will ourselves take and pay for them, taking over your claim against said Company.

"Upon the foregoing basis all of our claims against each other are mutually cancelled and our contract finally terminated.

"If this is in accordance with your understanding, please sign your name at the bottom of the letter."

Also the following letter:

"This will confirm our agreement that if these acceptances for logs furnished you by the Silver Spruce Company under your agreement with it dated September 5, 1919, are not paid by said Company at

maturity, we will take up the same and will protect you against responsibility on your indorsement thereof.

"If the said Company does not carry out its contract and takes and pays for said logs, we will be responsible to you for the price thereof and take the logs ourselves, taking over your claim against said Company."

December 27, 1919, C. F. Stone, the plaintiff here, commenced an action in the Circuit Court of Tillamook County against the Cummings-Moberly Company to recover the price of the logs assembled under his contract made with the Spruce Company on September 5, 1919, in which all of the contracts and above letters are attached to and made a part of the complaint. After alleging a breach of the contract by the Silver Spruce Company, the complaint says:

"That one of the main considerations for plaintiff entering into said contract with said Silver Spruce Company for the sale of said logs, and as an inducement for the plaintiff so doing, the defendant agreed with plaintiff that if said Silver Spruce Company failed to carry out its agreement with plaintiff, and failed to take and pay for said logs, that defendant itself would take and pay for the same, and be responsible to plaintiff for the price thereof; * * and the agreement between this plaintiff and the Silver Spruce Company, and the said agreement for defendant to be responsible to plaintiff for the price of said logs if the Silver Spruce Company failed to carry out its contract, was all one and the same transaction.

"That the Silver Spruce Company has wholly failed, neglected and refused to carry out its contract of September 5, 1919, with plaintiff hereinbefore referred to, a copy of which is hereto attached and marked Exhibit 'B'; that said Silver Spruce Company has failed to execute and deliver to plaintiff said Company's acceptance for the price of logs included in four rafts, although the certificate of the

Columbia River Log Scaling and Grading Bureau showing the number of feet included in said rafts has been delivered to it, said four rafts containing 262,471 feet.

"That said Silver Spruce Company has failed, neglected and refused to assign to the First National Bank of Tillamook, Oregon, the invoices against its customers for lumber manufactured from said logs that were taken, amounting to 299,000."

On the showing and petition of the defendant Cummings-Moberly Company, that case was removed to the Federal Court, where it is now pending.

On December 20, 1919, the Silver Spruce Company, then being insolvent, made what is known as a common-law assignment to the defendant, J. T. Burtchaell, trustee of all its property for the use and benefit of its creditors who would accept the terms and provisions of the assignment and creditors to the amount of about $80,000 duly filed acceptances.

In February, 1920, the plaintiff commenced the instant suit against the defendants, First National Bank of Tillamook, Oregon, the Bank of California, National Association, Silver Spruce Company, F. R. Alley and H. J. Alley, and J. T. Burtchaell, as trustee. After formal allegations, the plaintiff pleads the contract of September 5, 1919, between him and the Spruce Company; then alleges that it was agreed that the logs should be delivered and accepted within a reasonable time after the making of the contract and that thirty days was a reasonable time; that plaintiff rafted and delivered to the company 299,000 feet of logs for which it delivered its acceptance for $3,588, due and payable January 5, 1920, and he further delivered 262,471 feet of logs for which no acceptance was ever given and that at the request of the company he "kept the remainder of said logs at the

place where they were stored at the time of the making of said contract and had the same ready for delivery to said company at all times." It is then alleged that after the first delivery, the company neglected to return the raft sticks and through its neglect prevented the plaintiff from making future deliveries, "and said company thereupon requested plaintiff to hold said logs at the place they were then stored at the risk of said company," and without fault or neglect of plaintiff 74,169 feet of logs were lost and washed away; that in December, 1919, the company repudiated its contract and refused to accept or receive any more logs; that by reason thereof, and to protect himself from further loss, the plaintiff sold the remainder of the logs, to wit, 546,791 feet, to the defendants F. R. and H. J. Alley, for $12 per thousand feet, which was the reasonable market value. It is then alleged that from the deliveries which were made to it, the company "manufactured a portion of said logs into lumber and shipped a portion thereof, the quantity of lumber so shipped being to the plaintiff unknown"; that as the contract provides, the plaintiff discounted the acceptance given to him by the company with the First National Bank of Tillamook, "and in order to secure the payment thereof assigned to said bank certain invoices for lumber sold by it and manufactured from the logs herein first described, the amount of said invoice or invoices and against whom made out being to the plaintiff unknown"; that the acceptance was never paid, and on February 19, 1920, the plaintiff was compelled to take up the acceptance from the bank and is now the owner and holder thereof.

The complaint then sets out in full the assignment from the Spruce Company to Burtchaell, trustee, and

alleges that he took possession of all of the property therein described, including the logs and lumber therein described, and that he "paid no present consideration for said conveyance, but took the same as trustee for the benefit of defendants Banks herein named, and other creditors whose names are to the plaintiff unknown." That there was then on hand upward of 274,000 feet of logs which the plaintiff had delivered to the Spruce Company and 287,471 feet of lumber "less whatever portion thereof, if any, had been theretofore shipped by Silver Spruce Company"; that "the purchase price thereof was still due and owing to Silver Spruce Company, and subject to the right of plaintiff to have the purchase price of the logs sold by him as aforesaid paid therefrom"; that on the —— day of January, 1920, Burtchaell, as trustee, undertook to sell such logs then in his possession to the defendants F. R. Alley and H. J. Alley; that they took them over, well knowing "the rights of plaintiff to hold said logs as security for the purchase price"; "that plaintiff does not know the quantity of lumber manufactured from said logs, the quantity of the lumber shipped or the amount of invoices for such lumber turned over to any of the defendants, and he is not able to ascertain the same; that plaintiff alleges that defendants are in possession of either the logs so delivered, or the lumber manufactured therefrom, or the invoices therefor, or the proceeds of the same, and that they have knowledge or the details in regard thereto, and that all of said matters are subject to the right of plaintiff to hold the same under the lien given by the contract herein set out for the purchase price of said logs."

Plaintiff claims that he has no plain, speedy or adequate remedy at law; that the Spruce Company is insolvent; that on account of such transactions there

is due and owing to him $3,588, with interest from January 25, 1920, and the further sum of $4,039.68 with interest from January 5th, at 6 per cent, which amount prior to the filing of the complaint he requested defendants to pay or to turn over to him the logs and lumber covered by the contract and to account to him for the moneys received, but that the defendants failed and neglected to pay or account and deny that plaintiff has any rights, and plaintiff prays for judgment against the Spruce Company for those amounts; that the defendants be required to account to him for all of the logs delivered to the Spruce Company and the lumber manufactured therefrom now held by the trustee; that he have a decree for a lien upon the logs and the manufactured lumber and the proceeds thereof for the amount of his judgment against the Spruce Company, and that his lien be foreclosed and the property sold for satisfaction of his lien.

The defendants Burtchaell, Bank of California and National Association separately demurred to the complaint upon the ground that it did not state facts sufficient to constitute a cause of suit. The demurrers were overruled and the defendant Burtchaell filed an answer, in which he denied all of the material allegations of the complaint, and as a further and separate defense alleged the execution of the assignment to him by the Spruce Company and that on December 22, 1919, for and on behalf of the company's creditors, he took possession of all the company's property and has since managed "and is now managing and conducting the same as a common-law assignee of said Silver Spruce Company for the benefit of its general creditors in furtherance of said conveyance and agreement." At that time he alleges there

was in the yard of the company 84,140 feet of lumber
which was manufactured from logs which were sold
to it by plaintiffs; that when he took possession he
was not informed and did not know "that plaintiff
claimed or intended to claim any lien upon said logs
or lumber, and had no knowledge or notice of the con-
tract between plaintiff and said Silver Spruce Com-
pany." He then alleges facts tending to show that he
should have judgment against the plaintiff for the
amount of $1,117.76, and prays that plaintiff's lien
be disallowed and for costs. The answer of the Bank
of California and National Association was in the
nature of a general denial.

After the filing of the reply to Burtchaell's further
and separate answer, testimony was taken in open
court and upon such issues the case was taken under
advisement and on July 27, 1920, the court made its
findings of fact and conclusions of law, upon which it
entered a decree against the Spruce Company for
$6,737.67, with interest from January 5, 1920, at 6
per cent per annum; that the plaintiff have a lien
upon all proceeds of logs and lumber taken over by
defendant Burtchaell and the Spruce Company,
amounting to $7,315; that he have a judgment against
F. R. Alley and H. J. Alley for the sum of $3,240, the
reasonable value of the proceeds from the logs which
were taken over by them from Burtchaell and upon
which plaintiff held a lien; that he have a further
judgment against Burtchaell for $4,075, the proceeds
received by him from the sale of lumber which he
took over from the Spruce Company and upon which
plaintiff held a lien; "that said judgment against
said parties shall only be for the purpose of satisfy-
ing the judgment of said plaintiff against defendant
Silver Spruce Company above set forth, and all pro-

ceeds now in the hands of said defendants arising
from the sale and disposal of said lumber and logs
shall be subject to the lien of plaintiff for the amount
of the judgment granted against defendant Silver
Spruce Company''; that at all the times alleged plain-
tiff had a valid and existing lien upon the logs and
lumber taken over by the defendant Burtchaell for
the amount of $6,737.66; ''that said lien extends to
the proceeds received by the defendant Burtchaell in
the disposal of said property, and to the reasonable
value of the logs taken over by defendants Alley'';
and that the case should be dismissed as to the First
National Bank of Tillamook, Oregon, the Bank of
California, and National Association.

From this decree the defendant Burtchaell appeals,
claiming that the court erred in overruling his de-
murrer to the complaint, in finding that plaintiff had
a lien on any of the logs sold and delivered to the
Spruce Company, or upon any of the lumber cut
therefrom or the proceeds thereof, or in finding that
Burtchaell took possession of more than 84,140 feet
of lumber or that there is due and owing to the plain-
tiff from him $6,737.66, or any other sum, or that any
funds held by him are subject to a lien in plaintiff's
favor, or that he is entitled to a judgment and decree
against Burtchaell for any sum, and in not dismissing
the suit as to him.

The plaintiff Stone appeals, claiming that the court
erred in not rendering judgment in his favor for
$7,627.68; in not decreeing that plaintiff should have
a lien upon all the proceeds from logs and lumber
taken over by Burtchaell for the full amount of his
claim; in not decreeing that he had a valid and exist-
ing lien upon logs and lumber so taken over for
$7,627.68; in dismissing the case as to the First Na-

tional Bank of Tillamook, Oregon, and the Bank of California and National Association, and "in not finding and decreeing that the amount of such proceeds upon which plaintiff was entitled to a lien was not less than $8,500 and upward."    REVERSED.

For C. F. Stone, plaintiff and appellant, there was a brief with oral arguments by *Mr. H. T. Botts* and *Mr. George P. Winslow.*

For respondents, The Bank of California and J. T. Burtchaell, there was a brief over the name of *Messrs. Bauer, Greene & McCurtain,* with an oral argument by *Mr. Thomas G. Greene.*

For the First National Bank of Tillamook, there was a brief and an oral argument by *Mr. Sidney S. Johnson.*

JOHNS, J.—R. C. L., Volume 17, page 601, says:

"It is indispensable to the existence of a common-law lien that the party who claims it should have an independent and exclusive possession of the property, the right to the lien being based directly upon the idea of possession."

Section 10236, Or. L., provides:

"Every person performing labor upon or who shall assist in obtaining or securing sawlogs, spars, piles, cordwood, or other timbers, has a lien upon the same for the work or labor done upon or in obtaining or securing the same, whether such work or labor was done at the instance of the owner of the same or his agent."

Section 10238, enacts:

"Any person who shall permit another to go upon his timber land and cut thereon sawlogs, spars, piles, cordwood, or other timber has a lien upon such logs, spars, piles, cordwood, and timber for the price

agreed to be paid for such privilege, or for the price such privilege or the stumpage thereon would be reasonably worth, in case there was no express agreement fixing the price.''

Section 10239, Or. L., provides that such liens shall have priority over any and all other liens. As distinguished from either the common law or statutory lien, the plaintiff claims that under its contract with the Spruce Company of September 5th, he has an equitable lien upon all the logs which came into the possession of Burtchaell as trustee and upon all the lumber which also came into his possession which was manufactured out of logs which he delivered to the Spruce Company and that, the trustee having sold such logs and lumber, he has an equitable lien upon and is entitled to the proceeds of such sales. That involves the meaning and construction of his contract with the Spruce Company. Although equity often recognizes and enforces it, the law-writers do not undertake to give an accurate definition of what is an equitable lien. R. C. L., Vol. 17, says:

Page 603: ''The great difference between the equitable and common-law lien is that the former is not conditioned upon the possession of the thing sought to be charged, while in the latter this is absolutely essential. An equitable lien is not an estate or property in the thing itself, nor a right to recover the thing; that is, a right which may be the basis of a possessory action. It is neither a *jus ad rem* nor a *jus in re.''*

Page 604: ''A party may, by manifest intent and agreement, create a security, charge, or claim in the nature of a lien on real as well as on personal property whereof he is the owner or in possession, which a court of equity will enforce against him, and volunteers or claimants under him, with notice of the agreement. To dedicate property to a particular purpose, to provide that a specified creditor and that creditor

alone shall be authorized to seek payment of his debt from the property or its value, is unmistakably to create an equitable lien."

Page 607: "Where a contract is proved, the rights of the parties depend upon the terms of the contract, and it has been said that no lien, either specific or general, can be claimed so as to interrupt the performance of the actual contract between the parties, whether that contract is express or is to be inferred from the general course of dealing."

Page 614: "It is settled beyond question that a court of equity is the appropriate tribunal for the enforcement of an equitable, as distinguished from a statutory or common-law lien."

The contract between the plaintiff and the Spruce Company of September 5, 1919, recites:

"Stone hereby sells to the Company and the Company hereby buys from Stone, all those certain Spruce logs gotten out by Stone under his contract dated March 11th, 1919, with the Cummings-Moberly Company" amounting to 1,182,431 feet at the agreed price of $12 per thousand.

After reciting where the logs are and that they are again to be rafted and scaled, the contract further says:

"As each raft is completed and scaled, the logs therein shall become the property and at the risk of the Company, and the Company agrees that, immediately upon the delivery to it of the certificate of the Columbia River Log Scaling and Grading Bureau showing the number of feet included in a raft, the Company will promptly execute and deliver to Stone the Company's acceptance for the price of the logs included in such raft at the rate of twelve dollars ($12) per thousand feet."

2, 3. The execution of the contract of March 11, 1919, between the plaintiff and the Cummings-Moberly Company or what was done under it or the terms and

conditions or the reasons why it was canceled, are not pleaded as a defense; neither is there any reference in the answer here, to the complaint filed by the plaintiff against the Cummings-Moberly Company in the Circuit Court of Tillamook County on December 27, 1919. The legal effect of the pleadings in the one case cannot be considered with reference to the other or treated as an election of remedies, but the complaint there can be considered here, for the purpose of showing the history of the transaction, the relation of the parties and the reasons why the contract was executed between the plaintiff and the Spruce Company on September 5, 1919, and how it was then understood and construed by the plaintiff.

4. March 11, 1919, the plaintiff made his contract with the Cummings-Moberly Lumber Company, which the evidence shows to be a solvent and responsible corporation. Under its terms and conditions on September 5, 1919, the plaintiff then had 1,527 logs ready for delivery, which, as shown by the official certificates of the Columbia River Log Scaling and Grading Bureau, measured 1,182,431 feet and the agreed contract price was $12 per thousand. By reason of a change in its plans that company did not want to take or pay for the logs or carry out its contract. In that situation, the plaintiff entered into the contract in question with the Silver Spruce Company of September 5th, by which that company was to take over and pay for the 1,527 logs after they were rafted and again scaled by the same Grading Bureau, and to induce the plaintiff to make the new contract and as one of its considerations, and concurrent therewith and as a part thereof, the Cummings-Moberly Company wrote the plaintiff the two letters above of September 5th, the apparent legal effect of which was

100 Or.—35

that, if the Spruce Company should fail to carry out its agreement with the plaintiff and take and pay for the 1,527 logs at the same agreed price, the Cummings-Moberly Company would then pay for the logs and should have an assignment of the plaintiff's claim against the Spruce Company. It appears that the Cummings-Moberly Company was a responsible corporation and that the Spruce Company was not. The plaintiff testifies:

"Q. You say at the time of that second delivery of November 13th, along to December 22d, that you had doubts about the solvency of the Silver Spruce Company?

"A. I had my doubts about them for a year and a half before I had any contract with them.

"Q. You thought it was risky to do business with them?

"A. Yes, sir; I had a little doubt; yes, sir; I wouldn't sell to the Silver Spruce Company unless they would guarantee if they went broke they would help me out.

"Q. And they did guarantee it?

"A. Between me and them."

The plaintiff had an apparently valid contract with the Cummings-Moberly Lumber Company, which was responsible, and the 1,527 logs were ready for delivery. Knowing the financial condition of the Spruce Company, it is fair to assume that the plaintiff would not enter into the contract of September 5th, and deliver the logs to it without the Cummings-Moberly Lumber Company guaranteeing the payment of the account, and that in making the new contract he relied upon the guaranty. The fact that the plaintiff had such a guaranty was to be a matter within the exclusive knowledge of the Cummings-Moberly Company and himself, and it was kept a secret until about

the time that the plaintiff commenced his action to enforce it. It also appears that none of the other creditors of the Spruce Company had any knowledge of the terms or provisions of the contract between the Spruce Company and the plaintiff, and that the plaintiff never claimed or asserted that he had any lien under that contract until after the common-law assignment was made.

It was in this situation and for such reasons that the contract in question was made between the plaintiff and the Spruce Company. It recites that the plaintiff sells to the company and the company buys from him all the "spruce logs gotten out by Stone under his contract dated March 11, 1919, with the Cummings-Moberly Company [said contract having been canceled by mutual consent]." It will thus be noted that specific reference is made in the new contract to the old. It further recites:

"As each raft is completed and scaled, the logs therein shall become the property and at the risk of the company."

In consideration thereof the company agrees that upon receipt of the scaling certificate, it will execute and deliver to the plaintiff its acceptance "for the price of the logs included in such raft at the rate of twelve dollars per thousand feet." Under this clause, when the scaling certificate is issued and the acceptance delivered, the title passes to the Spruce Company for the logs evidenced by the certificate. The giving of the acceptance is nothing more than written evidence of the Spruce Company of the amount which it owes the plaintiff as shown by the scaling certificate. The acceptance within itself cannot be construed as a security for the debt. It is nothing more than evidence of the debt.

The contract further recites:

"It is understood that Stone expects to discount said acceptance with the First National Bank of Tillamook"; that is to say, that upon the receipt of an acceptance from the Spruce Company, the plaintiff intended to discount it at the bank and place the proceeds to his personal credit. In the ordinary course of business that is what he would do. Following this "the company agrees that in order to further secure payment of said acceptances [which shall mature ninety days after their respective dates] the company will assign to the First National Bank of Tillamook, or such other person as Stone may direct, the invoices of the company against its customers for the lumber manufactured from said logs." This contemplates that within ninety days after the logs are bought and sold, that the Spruce Company will have manufactured them into lumber and that the lumber will have been sold, and that as the sales are made the invoices will be assigned and attached to the acceptances which had been delivered to the plaintiff and by him discounted to the bank. In other words, in the ordinary course of business, within ninety days the Spruce Company would manufacture the logs into lumber and sell the lumber and assign the invoice against the purchaser to the holder of the acceptance. It is true that the contract says that it agrees to do this "in order to further secure payment of said acceptances," but it is also true that by the previous portions of the contract the acceptances were not secured in any manner and that no previous provision was made in the contract for their security. Up to that time nothing more had been done other than the sale and purchase of the logs and the issuing of the acceptances to the plain-

tiff and the discount of them by him to the bank. Such things would not in any way secure payment of the debt; they would only be evidence of the debt.

The remaining question is whether, within itself, the agreement of the Spruce Company to assign to the bank the invoices of its customers for the lumber manufactured from the logs to secure the payment of the acceptances, constitutes an equitable lien upon the logs or the unsold lumber for the purchase price of the logs, under the contract. In the instant case the defendant Burtchaell is a common-law assignee, and as such represents unsecured creditors of the Spruce Company to the amount of about $80,000. It is conceded that as such assignee, he sold and converted into money about 300,000 feet of the logs which the Spruce Company had purchased from the plaintiff under the contract of September 5th, and for which the company gave the plaintiff its acceptance, which he discounted at the bank and that the acceptance was never paid by the company and for which the plaintiff settled with the bank and is now the owner and holder of that acceptance. Also that as such trustee, Burtchaell sold about 85,000 feet of lumber which was manufactured from logs which the Spruce Company purchased from the plaintiff; that the trustee now has the proceeds from the sale of such logs and the sale of such lumber; that he never signed any invoices for such lumber to the bank or any one else and that he refuses to account to the plaintiff for such proceeds. There is no proof that Burtchaell now has any proceeds or that he ever collected any money from invoices of lumber that was sold or shipped by the Spruce Company itself to any of its customers. The plaintiff claims that his contract gives him an equitable lien on the proceeds

from the sale of the logs in the pond and the sale of the lumber which was at the mill and unsold at the time Burtchaell qualified as trustee under the common-law assignment.

In the early case of *Wright* v. *Ellison,* 1 Wall. 16 (17 L. Ed. 555, see, also, Rose's U. S. Notes), it is said:

"To constitute an equitable lien on a fund there must be some distinct appropriation of the fund by the debtor. It is not enough that the fund may have been created through the efforts and outlays of the party claiming the lien."

This case has been followed and approved by all the text-writers and by numerous courts.

In *Christmas* v. *Russell,* 14 Wall. 69 (20 L. Ed. 762), the court says:

"A mere promise, though of the clearest and most solemn kind, to pay a debt out of a particular fund, is not an assignment of the fund even in equity. To make an equitable assignment there should be such an actual or constructive appropriation of the subject matter as to confer a complete and present right on the party meant to be provided for, even where the circumstances do not admit of its immediate exercise."

In *Trist* v. *Child,* 21 Wall. 441 (22 L. Ed. 623), the court says:

"It is well settled that an order to pay a debt out of a particular fund belonging to the debtor gives to the creditor a specific equitable lien upon the fund, and binds it in the hands of the drawee. A part of the particular fund may be assigned by an order, and the payee may enforce payment of the amount against the drawee. But a mere agreement to pay out of such fund is not sufficient. Something more is necessary. There must be an appropriation of the fund *pro tanto,* either by giving an order or by transferring it otherwise in such a manner that the holder is

authorized to pay the amount directly to the creditor without the further intervention of the debtor.''

The case of *Di Niscia* v. *Olsey*, 162 App. Div. 154 (147 N. Y. Supp. 198), involves the question of an equitable lien and it is there said:

''The difficulty in the way of affirmance is that proof of a breach of the contract only does not warrant this decree of the equity court. There should also appear proof that clearly established the intention that the premises would 'be held, given, or transferred as security for the obligation' of the contract.''

In *Cook & Co.* v. *Black*, 54 Iowa, 693 (7 N. W. 121), the court says:

''In our opinion the evidence fails to establish the creation of a trust in the property, or to show the existence of facts entitling the plaintiffs to a lien upon the proceeds. The most that the evidence shows is an intention on the part of the debtor to apply the proceeds of the property to the payment in part of the debts due the plaintiffs. This intention was never consummated. It does not give the plaintiffs any precedence over the other creditors of the estate.''

In *Pettibone* v. *Thomson,* 72 Misc. Rep. 486 (130 N. Y. Supp. 284), it is held that:

''A written contract to pay a debt out of a designated fund without transferring any part of the fund, or authorizing the holder to pay directly to the creditor without further intervention of the debtor, does not constitute either an equitable lien on the fund or an equitable assignment thereof.''

Jones on Liens, Volume 1 (3 ed.), says:

''Section 31: To create an equitable lien by agreement, it must appear that the parties to it intended to create a charge upon the property. * *

''Section 32: The intention must be to create a lien upon the property, as distinguished from an agree-

ment to apply the proceeds of a sale of it to the payment of a debt.

"Section 43: An equitable lien arises from an order given by a debtor to his creditor to receive payment out of a particular fund, and this is effectual from the time the creditor receives the order or assignment, though the debtor become bankrupt before the order is received by the drawee.

"Section 45: An order upon a specific fund, of which the drawee has notice, though he has not accepted it, or though he may have refused to accept it, is effectual, not only as between the parties, but also as against the drawer's assignee in bankruptcy, or his voluntary assignee, for the benefit of his creditors.

"Section 48: A mere agreement, whether by parol or in writing, to pay a debt out of a designated fund, when received, does not give an equitable lien upon that fund, or operate as an equitable assignment of it. The agreement is personal merely. There must be an order, or something that places the creditor in a position to demand and receive the amount of the debt from the holder of the fund without further action on the part of the debtor; something that would protect the holder of the fund in making the payment.

"Section 50: To constitute an equitable lien on a fund, there must be some distinct appropriation of the fund by the debtor, such as an assignment or order that the creditor should be paid out of it.

"Section 51: The rule that an equitable assignment can be effected by a surrender of control over the funds or property assigned is one that is strictly held to. A promise that certain goods shall be held in trust for the benefit of another, and that the proceeds shall be paid to him, does not amount to an equitable assignment of the goods or specific lien upon them; for in such case the owner retains control of the goods, and may appropriate them or their proceeds to the payment of other creditors, and the holder of such promise cannot follow the goods any more than he could follow their proceeds. He has no lien either

upon the goods or their proceeds. The owner has violated his promise, and for this he is personally responsible.

"Section 52: The promise of a debtor to pay a debt out of a particular fund is not sufficient. There must be an appropriation of the fund *pro tanto,* either by giving an order on the specific fund, or by transferring the amount otherwise in such a manner that the holder of the fund is authorized to pay the amount directly to the creditor without the further intervention of the debtor. * * A sale of goods upon the mere promise of the purchaser to pay for them out of the avails of their sale, and of a stock of other goods then owned by the purchaser, does not give the seller a lien on the goods after their delivery, nor on the avails of their sale, that can be specifically enforced. Such an agreement merely creates the relation of debtor and creditor, and does not effectually appropriate the funds to the payment of the specific debt.

"Section 62: The delivery of a bill of lading to one who discounts a draft drawn against the shipment is a sufficient appropriation of the property to give the holder of the draft an equitable lien upon the property. Ordinarily the question of an equitable lien does not arise in such a case, because the delivery of the bill of lading amounts to a pledge and delivery of the property itself."

Under the contract in the instant case, it was the intention of the parties that after their sale, the logs should be manufactured into lumber and that the Spruce Company should sell the lumber to its customers and as sales were made, that the invoices should be assigned to the bank and that the lumber should be manufactured and sold within ninety days after the sale of the logs. That is the reason why the contract provides that the acceptances "shall mature ninety days after their respective dates." The stubborn fact remains that until the lumber was

manufactured, sold and invoiced, there was no fund to assign or appropriate.

It must be conceded that there are no specific words in the contract which create a lien of any kind in favor of the plaintiff on either the logs or the lumber. The purchase price of the logs is not made a specific charge or lien and it is only by construction that a lien of any kind could be implied. It is true that the Spruce Company agrees to assign the invoices and that the assignment of the invoices when made would give a lien, but the fact remains that in the instant case, no invoices were ever made or assigned and that the agreement to assign the invoices was never carried out, and that without such assignment there could not be an appropriation of the fund and that without an appropriation there could not be an equitable lien. It would not be anything more than a breach of the contract to assign.

Again, although this state does not recognize a vendor's lien, yet where such a lien exists and it is not reserved, the courts hold that the taking of other security is a waiver of the lien. On principle, that rule of law should apply to an equitable lien. In the instant case, the plaintiff knew of the financial condition of the Spruce Company and was afraid to trust it and for such reason, demanded and received the written guaranty of the Cummings-Moberly Company that it would protect and indemnify him from any loss arising out of his contract with the Spruce Company. That guaranty was one of the considerations which entered into his contract with the Spruce Company and without which it never would have been made. The contract does not expressly provide that the logs purchased should ever be manufactured into lumber; it only implies that it would be done in the

ordinary course of business. Neither does it expressly provide that all of the lumber so manufactured shall be invoiced to its customers or that all of such invoices should be assigned to the bank. Neither does it expressly prohibit the sale of the logs as such or the sale of the lumber manufactured from them without an invoice. In any event, as to the purchase price of the logs involved in this suit or any lumber manufactured from them, no "invoices of the company against its customers" were ever assigned to the bank and without an assignment there could not be any appropriation of the fund and without an appropriation of the fund, plaintiff would not have an equitable or any other kind of a lien. As to Burt-chaell, the decree is reversed and the suit is dismissed.

REVERSED.   SUIT DISMISSED.

BURNETT, C. J., and BEAN and BROWN, JJ., concur.

---

Petition for rehearing filed May 16, former opinion sustained and rehearing denied May 31, 1921.

PETITION FOR REHEARING.

(198 Pac. 244.)

On petition for rehearing. Petition denied and former opinion approved.

*Messrs. Botts & Winslow,* for the petition.

*Messrs. Bauer, Greene & McCurtain* and *Mr. S. S. Johnson, contra.*

BURNETT, C. J.—5. In a brief critical in terms and savoring of diatribe, counsel for plaintiff urge that a rehearing should be granted in this case. We

recall that the plaintiff was the owner of some spruce logs and by a contract in writing, of date September 5, 1919, agreed as follows:

"Stone hereby sells to the company and the company hereby buys from Stone all those certain spruce logs got out by Stone under his contract dated March 11, 1919. * * "

It is further stipulated in the contract that—

"As each raft is completed and scaled, the logs therein shall become the property and at the risk of the company, and the company agrees that immediately upon the delivery to it of the certificate of the Columbia River Log Scaling and Grading Bureau showing the number of feet included in a raft, the company will promptly execute and deliver to Stone the company's acceptance for the price of the logs included in such raft at the rate of twelve dollars per thousand feet."

The language of the agreement upon which the plaintiff predicates his lien and the right to hold the proceeds of the sale of lumber manufactured from the logs, as well as the logs and lumber remaining on hand, is as follows:

"It is understood that Stone expects to discount said acceptance with the First National Bank of Tillamook, and the company agrees that in order further to secure payment of said acceptances (which shall mature ninety days after their respective dates) the company will assign to the First National Bank of Tillamook, or such other person as Stone may direct, the invoices of the company against its customers for the lumber manufactured from said logs."

As authority supporting plaintiff's contention, there is cited Section 1235, 3 Pom. Eq. Jur. (4 ed.), as follows:

"The doctrine may be stated in its most general form, that every express executory agreement in

writing, whereby the contracting party sufficiently indicates an intention to make some particular property, real or personal, or fund, therein described or identified, a security for a debt or other obligation, or whereby the party promises to convey or assign or transfer the property as security, creates an equitable lien upon the property so indicated, which is enforceable against the property in the hands not only of the original contractor, but of his heirs, administrators, executors, voluntary assignees, and purchasers or encumbrancers with notice. Under like circumstances, a merely verbal agreement may create a similar lien upon personal property. The ultimate grounds and motives of this doctrine are explained in the preceding section; but the doctrine itself is clearly an application of the maxim, equity regards as done that which ought to be done. In order, however, that a lien may arise in pursuance of this doctrine, the agreement must deal with some particular property, either by identifying it, or by so describing it that it can be identified, and must indicate with sufficient clearness an intent that the property so described, or rendered capable of identification, is to be held, given, or transferred as security for the obligation.''

6. It is to be noted that the lien there described depends upon an express executory agreement in writing where the contracting party indicates an intention to make some particular property, real or personal, or fund, therein described or identified, security for a debt or other obligation, whence arises an equitable lien upon the property, enforceable against that property, not only in the hands of the original contractor but his successors in interest and purchasers or encumbrancers with notice. It is said that the doctrine is an application of the maxim that regards that as done which ought to be done. In respect to this last observation, that which ought to

be done is that which the parties contracted to do but have not done. It is not grounded on mere moral obligation or upon a supposed advantage which either of the contracting parties has lost by his mere inadvertence. The lien must be some hold upon the identical property in dispute and this in addition to the monetary obligation represented by the debt for which it is supposed to be security. The lien is ancillary to and separate from the debt itself. It must be more than a mere promise to pay out of some particular fund. Such a promise is of no more dignity or obligation than the original agreement to pay the debt itself.

Many cases are cited under the section of Pomeroy already quoted. For instance, in *Title Insurance & Trust Co.* v. *California Development Co.*, 171 Cal. 173 (152 Pac. 542), the effort was to charge an irrigation system in which the canal began in California and owing to the contour of the country crossed into Mexico and back into the State of California. Because of the conditions of the laws of Mexico a foreign corporation could not hold title to lands within a certain zone adjacent to the international boundary. To overcome this obstacle a subsidiary corporation was formed to hold title to the part of the system in Mexico. The parent corporation held a large block of the shares in the Mexican corporation. A deed of trust covered those shares of the Mexican plant and authorized a sale of the property to pay the bonds of that concern. The principal question in the case was the power of a court of equity to compel the disposition of realty or other property situated beyond its jurisdiction, and it was held that as equity operates upon the person in the enforcement of its decrees, the foreign property could

be affected by the judgment of the court where the parties were within the jurisdiction of the court and subject to its process. It was further held that the whole plant could be sold in its entirety, because the contract of the parties contemplated such a result. In other words, there was expression of the intent to create a lien, and designation of the property involved.

In *United States Fidelity & Guaranty Co.* v. *Fidelity Trust Co.*, 49 Okl. 398 (153 Pac. 195), there was an express written agreement to bond and mortgage a railroad to be built by subscriptions, which security was given to accomplish the repayment of those very subscriptions; and on this express agreement the lien was enforced against those in privity with the railroad company to whom the subscriptions were made. In *Walker* v. *Brown,* 165 U. S. 654, there was an actual delivery of certain municipal bonds to the debtor, with the written agreement that they should be placed as collateral to the debtor's note. In *Ketchum* v. *St. Louis,* 101 U. S. 306, the case depended upon a public statute which authorized St. Louis County to issue $700,000 in bonds in aid of the Pacific Railroad Company, and required the custodian of the company's funds to pay certain monthly installments in liquidation of the bonds and interest thereon. In *Hurley* v. *Atchison, Topeka & S. F. Ry. Co.*, 213 U. S. 126 (53 L. Ed. 729, 29 Sup. Ct. Rep. 466, see, also, Rose's U. S. Notes), the company had a contract with a coal mining corporation whereby the latter agreed to furnish such coal as the railroad company required to operate its trains, and on the fifteenth of each month the railroad company should pay for the coal delivered during the preceding month. The coal company became involved

and in order to meet its pay-roll a supplemental agreement was made with the railroad company whereby the latter paid in advance for coal to a certain amount. It was held as against the assignee in bankruptcy of the coal company that he stood in no better plight than his assignor, and that the circumstances showed an intent to pledge the coal for the advances made by the railroad company. There, the coal to be mined was distinctly specified as the subject of the lien.

In *Ingersoll* v. *Coram*, 211 U. S. 235 (53 L. Ed. 208, 29 Sup. Ct. Rep. 92, see, also, Rose's U. S. Notes), it was expressly stipulated that Ingersoll was to be paid his fee as attorney for contestant of the Davis will, "out of the funds secured from the estate," and the amount of the fee was also specified. In all of these cases there is an express designation of the property to be affected and the amount for which it is to be charged, so as to leave nothing for future adjustment in that respect.

The instrument upon which the plaintiff bases his suit expressly provides that the property and possession thereof shall pass to the Silver Spruce Company. It is never intimated anywhere in the contract that there was any intention for Stone to retain possession of the logs or the lumber. All that the Silver Spruce Company agreed to do was to furnish security, not to Stone, but to those to whom he might negotiate the acceptances. We also note that it proposed to assign as security, not the property itself, but the "invoices of the company against its customers for the lumber manufactured from said logs." An "invoice in commercial transactions" is defined to be a written account of the particulars of merchandise shipped or sent to a purchaser, consignee or factor,

etc., with the value or prices and charges annexed; *Merchants' Exchange Co.* v. *Weisman,* 132 Mich. 353 (93 N. W. 869). "An invoice of goods is·merely another term for bill rendered": *Pipes* v. *Norton,* 47 Miss. 61. It was held in *Dows* v. *Bank,* 91 U. S. 618 (23 L. Ed. 214), that—

"An invoice is neither a bill of sale nor evidence of a sale, and, standing alone, furnishes no proof of title."

It differs from a bill of lading.

This court in *Walker* v. *First Nat. Bank,* 43 Or. 102 (72 Pac. 635), speaking by Mr. Justice BEAN, said:

"A bill of lading represents and stands for the property for which it was given, and the right and title of such property may pass by an indorsement of the bill, or by a mere delivery thereof, when such was the intention with which the indorsement or delivery was made. But neither the indorsement nor delivery of a bill of lading has any effect in passing the title or dominion or control over the property, except as the result of a contract between the parties, and the real transaction may be shown by parol."

We have, therefore, at hand an instance where there is no expression of an intent to pledge or grant a lien upon the logs or lumber, but only to assign invoices which do not affect the title of the property one way or the other. Taken according to its legal effect, the contract is secured only by the personal responsibility of the Silver Spruce Company. Still further, we derive from 27 R. C. L. 571, an authority cited by the plaintiff, this doctrine:

"There has been much discussion and confusion in the cases as to the origin of the principle giving a vendor, who has conveyed the legal title, a lien for the purchase money. It is not a rule of the common law but is exclusively a doctrine of equity, adopted, it has been said, from the civil law. This rule of the

100 Or.—36

civil law applied to the sale of both real and personal property, and courts of equity while adopting it as to realty have not done so as to personalty, and it is held that a seller of personal property has no lien for the price after the delivery of possession.''

As said by the same authority in the preceding section, ''our statutes evidence an abhorrence of secret liens.'' Hence it would not be compatible with trade facilities, if every seller who parts with the possession of goods could assert an equitable lien without giving any notice of it. It was to illustrate this policy of the law that the citations of our statutes granting liens upon logs and lumber were entered in the former opinion.

It is to be regretted that the plaintiff disposed of his property so hardly earned, as loggers do, to some irresponsible concern. But, having parted with his property and given up possession, no lien can be devised for him. He stands in no better relation to the property than any other creditor of the Silver Spruce Company. Our statutes have made it easy for sellers of such chattels to secure themselves for the purchase price, and in view of the precedents against equity's recognition of a vendor's lien on personal property with which the seller has parted possession, we cannot give the plaintiff relief.

We adhere to the former opinion.

FORMER OPINION APPROVED. REHEARING DENIED.

BEAN, BROWN and JOHNS, JJ., concur.