Motion to dismiss appeal overruled September 15, argued on the merits at Pendleton October 26, affirmed November 24, 1925, costs taxed January 12, 1926.

# JAMES PAUL ET AL. *v.* LIVESTOCK STATE BANK ET AL.

## (239 Pac. 108; 241 Pac. 56.)

**Appeal and Error—Failure to Move to Dismiss Appeal Within Ten Days After Learning of Failure to File Undertaking Held to Amount to Waiver of Objection.**

1. In view of statute requiring undertaking on appeal to be served on adverse party, where more than twenty-seven days elapsed between service of notice of appeal and service and filing of undertaking, on failure by respondents to move in ten days after knowledge of failure to serve and file undertaking, as required by Supreme Court Rule 23, objection is deemed waived.

**Appeal and Error—Delay of One Day in Filing Abstract of Record Excused.**

2. Where abstract of record on appeal was bulky, filing it one day after extension of time allowed by court may be excused in view of evident good faith of parties in seeking to perfect appeal, but no delay will thereafter be excused which might tend to prevent hearing of appeal at proper term.

### ON THE MERITS.

**Deeds—Sales—Deed and Bill of Sale to Real and Personal Property Upheld Unless Procured by Threats Amounting to Legal Duress.**

3. Where deeds and bill of sale to real and personal property under which purchaser claimed were absolute on their face, transaction was required to be upheld unless they were procured by threats amounting to legal duress.

**Deeds — Sales — Burden of Proof on Plaintiffs to Establish Duress Sufficient to Set Aside Deed and Bill of Sale to Real and Personal Property.**

4. In suit to set aside deed and bill of sale to real and personal property because procured by duress, burden of proof was on plaintiff to establish such duress.

**Deeds — Sales — Plaintiffs Did not Sustain Burden of Establishing Duress Sufficient to Set Aside Deeds and Bill of Sale to Real and Personal Property.**

5. In suit to set aside deed and bill of sale to real and personal property for duress, plaintiffs *held* not to have sustained burden of establishing such duress.

3. Contracts procured by threats of prosecution of a relative as duress, see notes in Ann. Cas. 1917C, 1033; 26 L. R. A. 48; 20 L. R. A. (N. S.) 484; 37 L. R. A. (N. S.) 539; L. R. A. 1915D, 1118.

5. What amounts to duress, see note in 26 Am. Dec. 374.

**Deeds — Sales—Evidence Held not to Show That Sale of Real and Personal Property to Another was for an Inadequate Price and Perhaps Sham.**

6. In suit to set aside deed and bill of sale to real and personal property for duress, evidence *held* not to show that sale of real and personal property by purchaser to another was for an inadequate consideration and perhaps sham.

See (1) 4 **C. J.** 597.   (2) 4 **C. J.** 473.
Contracts, 13 **C. J.**, p. 365, n. 66.
Deeds, 18 **C. J.**, p. 428, n. 70.
Sales, 35 **Cyc.**, p. 157, n. 86.

From Harney: LOUIS P. HEWITT, Judge.

In Banc.

MOTION TO DISMISS APPEAL OVERRULED.

For the motion, *Messrs. McCulloch & Duncan.*

*Contra, Mr. H. V. Schmalz.*

McBRIDE, C. J.—1. This is a motion to dismiss the appeal. The record presents a singular mixture of mistakes and omissions. The first ground is the failure to serve and file an undertaking on appeal within the time required by law. This case was decided by Judge HEWITT, April 2, 1925. On April 4th, notice of appeal was served and filed. On May 1st, an undertaking on appeal was filed, and a transcript on appeal was filed June 4, 1925. The abstract of record was filed with the clerk at Pendleton, July 16th.

Thus it will be seen that twenty-seven days elapsed between the service of the notice of appeal and service and filing of the undertaking. It appears from the statement of counsel for appellants that after he made service of the notice of appeal, he applied to the judge, who tried the case, to fix the amount of the undertaking, which was to include a stay of proceed-

ings. The court fixed the stay bond at $2,500, which appellants were unable to give and appellants' attorney applied to the court for a reduction. On the twenty-fifth day of April, the judge wrote to appellants' attorney suggesting an ordinary appeal bond in the sum of $300. instead of the stay bond, which letter was received on April 28th, and on May 1st appellants executed and served the required undertaking and surrendered their ranch to the respondents.

The motion to dismiss, for the reason that the undertaking was not filed within ten days after service of notice of appeal, was not made within ten days after that fact came to the knowledge of the appellants. The statute requires an undertaking to be served on the adverse party. It is certain, therefore, respondents must have known that it had not been served within the time required by law, and under Rule 23 of this court, it was their duty to file a motion to dismiss within ten days after the failure to so serve and file the undertaking came to their knowledge. Otherwise, the objection is deemed to be waived: *Mitchell* v. *Coach*, 83 Or. 45 (153 Pac. 478, 162 Pac. 1058). See, also, *Stone* v. *First Nat. Bank*, 100 Or. 528 (193 Pac. 1023, 197 Pac. 304, 198 Pac. 244.)

2. By an order of this court the time for filing the abstract of record was extended to and including July 15th. A copy was sent to the printer with instructions to forward printed copies to appellants' attorney not later than the 12th of July, but instead of doing this, the printer sent the copies direct to the clerk at Pendleton, where they arrived and were filed on the 16th, one day late. Copies were received by appellants' attorney and served on the 16th and filed a day or two later.

The abstract is a bulky affair and evidently an expensive one to print, and the fact that it was prepared indicates that the appellants were doing everything in their power to perfect their appeal. The time for filing the brief was extended by an order of this court and the briefs were filed in time.

The filing of the abstract of record within the required time is not a jurisdictional matter, and in view of the evident good faith of the parties in seeking to perfect their appeal as shown by their having printed an expensive abstract and brief, we feel disposed to excuse the omission; but there is a limit somewhere to judicial charity to the mistakes of counsel, and, so far as appellants are concerned, no delay on their part will hereafter be excused which might tend to prevent the hearing of this appeal at the October term of court at Pendleton.

The motion is overruled.    MOTION OVERRULED.

---

## ON THE MERITS.

### (241 Pac. 56.)

McBRIDE, C. J.—This is a suit brought to set aside certain deeds and bills of sale given by plaintiffs to C. H. Leonard and later to W. H. Craven on the ground that the same were procured by fraud, threats and duress. The particular threats alleged being, the grantees in said instruments threatened, that unless plaintiffs executed said instruments, the grantees therein would prosecute James H. Paul for a felony and cause him to be sent to the penitentiary.

While a long-detailed history of the transactions between the parties would be unprofitable, an outline thereof may be summarized about as follows: In July, 1916, plaintiffs executed a mortgage to R. C.

Goodwin embracing 760 acres of land in Harney County, and also about 150 head of horses, 40 cattle, a band of ewes containing about 2,400 head, and 700 lambs, being the whole of Paul's flock except wethers and coarse wool lambs.   The mortgage was given to secure the payment of a promissory note for $12,000, dated July 19, 1916, with interest at 10 per cent per annum, with the usual provision for costs and attorney's fees in case of suit.   It was stipulated in the mortgage that it should not cover the wool or increase of the sheep described therein, but that the same might be sold to cover the expenses connected therewith, except that the mortgagors should keep the number of sheep complete with sufficient of the increase to keep up the number mentioned in the mortgage.

Later, Goodwin died and the mortgage became the property of his administrator.   On November 20, 1919, while the Goodwin mortgage was still subsisting and unpaid, Paul borrowed $9,000 from the Portland Cattle Loan Company and executed a chattel mortgage on all his sheep including those embraced in the Goodwin mortgage.   On June 30, 1920, this mortgage was renewed in the sum of $10,000, and on December 31, 1920, was again renewed in the sum of $13,500, the increase representing operating expenses incurred.

In all of these mortgages it was covenanted that the personal property was free from all encumbrances.   On January 11, 1921, the latter mortgage was assigned to the Live Stock State Bank.   After the Live Stock State Bank acquired this note and mortgage, it became aware, for the first time, of the existence of the Goodwin mortgage and of the fact that it was the holder of only a second mortgage.   At this juncture, the Live Stock State Bank, in order to

secure itself, found it necessary to acquire control of the Goodwin note and mortgage and Mr. C. H. Leonard, an attorney of Bend, interviewed the Pauls, under circumstances hereinafter alluded to, with the result that they conveyed to him in trust for the Live Stock State Bank all their real property and by a bill of sale of the same date conveyed to him in trust for said bank all their livestock, including sheep, lambs, horses, mules and cattle, all equipment and feed, camp outfit, an automobile and a note and mortgage for $2,000 given by W. J. Taylor to James Paul.

The bill of sale also contained the following stipulation:

"This conveyance as well as the deed to the land is made to C. H. Leonard, the attorney for Live Stock State Bank, in the nature of a trust, and to facilitate foreclosure proceedings by him on the Goodwin and Live Stock State Bank mortgages, in order that the same may be done with as little extra cost and inconvenience as possible outside of what is provided for in the said notes and mortgages. These conveyances are made with the further understanding between the parties hereto that all of the personal property will be disposed of first and to the best possible advantage before a sale of the real estate shall be made, thus leaving the opportunity for the parties of the first part to save their home if possible even though the same may be covered by a mortgage. It is further understood that the said C. H. Leonard is in the actual possession of all of the property herein described, and the lands described in the deed, and that the said grantors, and vendors are only acting for him and under his instruction and authority."

Acting under this trust arrangement, Leonard claims that he made active attempts to dispose of the property without success. On May 28, 1921, plaintiffs executed and delivered to Leonard a paper au-

thorizing him to sell the whole property, real and personal, for $35,000. This paper is important as indicating the then idea of plaintiffs as to the salable value of the property, and is here given in full.

"Burns, Oregon, May 28, 1921.

"This is to acknowledge that we the undersigned having heretofore on the 10th day of May, 1921, given to C. H. Leonard for the Live Stock State Bank a Bill of Sale of all our personal property and a deed to all our lands, to facilitate in the foreclosure of the two mortgages now held by the said Live Stock State Bank amounting to nearly $30,000, said conveyances being given with the understanding that the personal property should be sold before a sale of the real property should be made to pay the indebtedness, and it now appearing that it may be to the best advantage to sell the real and personal property at one sale to some party who would buy the entire plant, now then this is to authorize the said C. H. Leonard to sell the entire property at one sale if it seems best that this should be done. The bottom price is to be $35,000.00 (unless it appears that it has to be sold for less and the parties hereto agree to that effect). It is further understood that the said C. H. Leonard will use his best judgment in getting all above this $35,000.00 for the property in case the same can be sold for a better price. Further than this it is understood that Mr. Weinstein is now trying to secure a $30,000 loan on this property to clean up the indebtedness of the Live Stock State Bank on its mortgages together with all costs etc. included therein including attorneys fees, and all efforts will be made to get this loan through, and in that event the sale would not need to be made.

"JAMES PAUL.
"ADELE PAUL."

On June 20, 1921, Paul gave to one Ike Weinstein an order on the Mullen-Fiser Warehouse for 10,000 pounds of wool, which had been sheared from his

sheep after they had been turned over to Leonard under the trust arrangement. In consequence of this action, defendant called upon Paul for some new arrangement and he executed to defendant Craven, who represented the Live Stock State Bank, an absolute deed for the real property and a bill of sale, absolute in form, to the personal property. Craven put a man in charge and Paul worked under his order securing for his services the sum of $75 per month.

Later, the deed to the realty and the bill of sale to personalty appearing to Craven to be technically objectionable, a new deed and bill of sale was requested and these instruments were executed by Paul and wife and delivered to Craven. Thereafter, the personal property was sold, much of it on credit, and the realty and some of the personalty was sold by Craven to Gordon and James McWilliams for $7,500, they taking a deed therefor, paying $3,500, and giving a mortgage for the balance. The Pauls refused to give the McWilliams brothers possession and thereafter brought this suit. The testimony was taken before a referee and the cause tried before Honorable LEWIS P. HEWITT, sitting for Judge BIGGS, and was decided in favor of the defendants and against the plaintiffs who bring this appeal.

3. The deed and bill of sale, under which Craven claims, are absolute on their face and, unless they were procured by threats amounting to legal duress, the transaction must be upheld.

4, 5. The burden of proof is upon the plaintiffs to establish such duress and we agree with the learned circuit judge in holding that in this respect plaintiffs have failed. Their testimony in that regard is flatly contradicted by evidence quite as respectable as that given by them.

6. While it is contended that they are ignorant people not capable of understanding their rights, their testimony indicates an average degree of intelligence. Paul's transactions in remortgaging the property and in giving an order to Weinstein for wool, which he must have known he did not own, indicates a disregard of common honesty that cannot be reconciled with ignorance. He was overwhelmed with debts and when he made these last conveyances evidently saw that he had no chance to extricate himself. It is claimed that the sale of personal property and the sale of realty to the McWilliams brothers was for an inadequate consideration and perhaps sham, but this is a mere surmise having not a shadow of evidence to support it. It was to the interest of Craven and to the creditors he represented to get everything out of the property that it would bring and, while witnesses differed as to its market value, we believe that this was done. If, as we believe, the transfers were not obtained by duress, the price they sold the property for is not material. Its bearing, if it had any, was only to indicate the probability that the Pauls would make the conveyances voluntarily. We think they did, and that this claim of duress was an afterthought begotten of a desire to retrieve something from the wreck of the Pauls possessions. We have carefully considered the testimony and while we regret that plaintiffs have, through misfortune in some respects, and the misconduct of Mr. Paul in other respects, lost their home and property, we are forced to agree with the Circuit Court in its conclusions. Many pages might be written analyzing the testimony, but such analysis would be of no interest or value to any-

body and would simply encumber the Reports with useless matter.

The decree is affirmed.          AFFIRMED.