Argued May 5, modified September 24, petition for rehearing
denied October 22, 1958

# OREGON MUTUAL INSURANCE *v.* CORNELISON

### ET AL
### 330 P. 2d 161

*S. H. Burleigh* and *Willard K. Carey*, La Grande, argued the cause for appellant. On the briefs were Dixon and Burleigh, La Grande.

*C. R. Neely* argued the cause for respondent, Mary A. Cornelison. On the brief were Helm & Neely and George H. Miller, La Grande.

*Charles R. Cater*, La Grande, argued the cause and filed a brief for cross-appellants, Jack L. Palmer and Arrietta Palmer.

Before PERRY, Chief Justice, and ROSSMAN, LUSK, McALLISTER and SLOAN, Justices.

LUSK, J.

This is a proceeding in interpleader involving conflicting claims to the proceeds of a policy of fire insurance on a dwelling house in Elgin, Union County, Oregon, which was partially destroyed by fire. The plaintiff, Oregon Mutual Insurance Company, which issued the policy, feeling that it could not safely pay the money to any of the claimants, filed this suit, paid the money into court, and was discharged.

The following persons were made parties defendants: Mary A. Cornelison, who was a conditional-sale purchaser of the land on which the house was built, and her husband, C. E. Cornelison; Jack L. Palmer and Arrietta Palmer, husband and wife, whose claim rests on an attachment lien; and J. F. T. Galloway, who asserted an equitable lien upon the fund.

The policy was issued May 23, 1955, in the amount of $8,000.00, payable to "C. E. Cornelison or Mary A. Cornelison." The fire occurred on December 13, 1955, and the loss was appraised at $4,712.44, which amount the insurance company paid into court.

Briefly stated, the facts are as follows: Early in the year 1955 C. E. Cornelison commenced the construction of the house. Sometime in May, Galloway, who is a builder by trade, agreed with Cornelison to complete

the house for him. Galloway was to be paid at the rate of $2.75 an hour for his labor, and purchase and pay for the necessary materials and be reimbursed by Cornelison for such expenditures. The insurance policy was obtained, as Galloway claims, pursuant to an agreement between him and Cornelison for Galloway's protection in case the house should be destroyed by fire.

The fire occurred before the house was completed, but it was occupied at the time by Mr. and Mrs. Cornelison.

On March 30, 1956, the Palmers commenced an action against Mary A. Cornelison to recover upon a promissory note executed March 8, 1955, by the latter in the principal sum of $6,500, and attached the proceeds of the insurance in the hands of the insurance company. A judgment for the Palmers was entered in such action July 5, 1956.

On March 29, 1956, Galloway filed an action against the defendant, Mary Cornelison, to recover the amount of his claim and levied an attachment on the insurance proceeds on April 12. After the interpleader complaint was filed Galloway abandoned this action and filed an answer setting up his claim to an equitable lien.

The amount of Galloway's claim, as established by the evidence, was $3,996.30, of which $2,664.75 was for labor and the balance for materials. The court by its decree awarded Galloway an equitable lien upon the fund, subject, however, to Mrs. Cornelison's homestead exemption in the amount of $5,000. ORS 23.240. The court found that the value of the premises after the fire was $2,662.76. The sum of $2,337.24 (the difference between $5,000 and $2,662.76) was therefore awarded to Mrs. Cornelison out of the fund in order to give her the benefit of the full amount of the homestead exemption. ORS 23.240. The balance of the fund

was awarded to Galloway, and the Palmers' claim was dismissed.

Galloway and the Palmers have appealed.

Galloway advances two contentions in this court: first, that the court erred in giving Mrs. Cornelison's homestead exemption priority over his equitable lien; second, that in any case the court placed too low a valuation on the premises as they were after the fire.

The Palmers do not question the propriety of the decree in favor of Mrs. Cornelison, but they urge: first, that, even though the court found correctly in favor of Galloway's claim to an equitable lien, their attachment was prior in time and superior in right to such lien; second, that if Galloway ever had an equitable lien he waived it by making an affidavit for a writ of attachment in which he swore that his claim was not secured by "any lien" and by the same act made an irrevocable election of remedies; and third, that the evidence does not warrant a finding that Galloway had an equitable lien. The Palmers, therefore, urge that the portion of the fund awarded to Galloway by the Circuit Court should be awarded to them.

In the view we take of the case it is only necessary to consider the claim of Galloway to an equitable lien. For that purpose a more detailed statement of the evidence is desirable.

At first Galloway gave Cornelison gratuitous help in preparing the foundation for the house. Later. he began to work for him for wages, and on May 24 he entered into the agreement to complete the construction mentioned above. Before this agreement was consummated, however, he discussed with Cornelison several times the subject of fire insurance. After stating that he was employed by Cornelison as a carpenter

and worked with him on the job at $2.75 an hour, Galloway testified as follows:

"Q Now, for how long did you continue to work with him on that basis?
"A Until the 24th of May.

"Q And was the basis or the arrangement of your employment changed in any way at that time?
"A On the 24th of May it was.

"Q In what way was it changed? What was your new arrangement with him?
"A That I take over the construction of the house at two seventy-five an hour; that I would buy and furnish the material that I acquired and pay for it; that he could help on the house as he wanted to, and with the understanding that if I took the construction of the house over, that it would be insured so that if anything happened I would be sure of getting my money out of it.

"Q Where did this conversation take place?
"A On the job.

"Q Inside or outside the house?
"A I imagine both. We talked about it several times before the deal was consummated.

"Q Now, who was to effect the insurance?
"A Beg pardon?

"Q Who was to take out the insurance?
"A Why, he was to take it out so that I would be protected.

"Q Was there any agreed amount of insurance?
"A Yes, agreed on eight thousand dollars.

"Q I take it this was a fire insurance policy, was it?
"A Oh, yes, fire insurance.

"Q Did you stipulate in any way that the insurance policy should be taken out made payable to you?
"A No.

"Q But it was, you say, for your protection?
"A That's right."

Galloway testified that he would not have built the house without the agreement of Cornelison to insure for his protection. He further testified that Cornelison asked him who would write the policy and he gave Cornelison the name of the agent who solicited and wrote the policy. After the policy was received by Cornelison, Galloway commenced to buy materials to go into the construction of the house. He knew that the policy provided that the loss was payable to the Cornelisons and that was satisfactory to him. His agreement with Cornelison was that his money would come out of the insurance money in case of a fire, but nothing was said about whether he would receive his money from the company or from the Cornelisons. There is evidence that, when Cornelison received the policy from the agent, he said that "it would protect him as well as Galloway" and that, after the fire, he made the statements, "I had to carry the insurance for [Galloway's] protection and mine" and "I've got Floyd Galloway there to thank for the insurance. If it hadn't been for him I wouldn't have a policy of insurance."

On cross-examination Cornelison testified:

"Q And do you dispute in any way that he—his claim that he has presented in this case for 3,700 odd dollars for labor and material?
"A Well, yes, I will.

"Q I see, but nevertheless, there was money there that was undoubtedly owing to him in the form of money invested?
"A There was money there in the form of wages, absolutely.

"Q For labor and material?
"A Absolutely, yes.

"Q So that when you took out a policy of insurance for eight thousand dollars, for whose protection was that taken out?

"A Well, I figured it was for my own.

"Q For your own, but you only had $2,600.00—$2,800.00 of material in the place and your labor, didn't you?

"A There wasn't any more than that in the place at the time the policy was bought, if that much.

"Q That's right, but you took out a policy that was going to give coverage for eight thousand dollars which is a long way above and beyond what you had as a stake in that property, wasn't it?

"A It probably would have been.

"Q So it—was it not your intention then that the coverage of eight thousand dollars should insure you for what you had and Mr. Galloway for what he had and what he intended to put into the place from time to time?

"A It was for coverage and if Mr. Galloway would have asked me personally at the time to put his name in the policy or any other thing—I took his advice and he shuffled the papers and I took his advice and signed papers and I listened to him, and if he would have asked me for protection, I would have put him in the policy clause,—

"Q Just a minute—

"A —but, therefore, he did not ask me."

The Palmers' promissory note for $6,500 was secured by a mortgage on the property involved, executed by Mrs. Cornelison only. The Cornelisons were without funds to pay either the note or Galloway's claim. During the autumn of 1955 Cornelison, assisted by Galloway, made several unsuccessful efforts to obtain a loan on the property. It was not until December 2, 1955, that Galloway learned of the existence of the Palmers' mortgage. Up to that time, as he testified, he had expected to get his money out of such a loan.

On November 25, 1955, Cornelison filed a petition in bankruptcy.

■ It is settled law that a mere promise to pay a debt out of a particular fund is not sufficient to create an equitable lien on the fund even though the fund was created through the effort and outlays of the party claiming the lien. *Stone v. First National Bank of Tillamook*, 100 Or 528, 550, 558, 193 P 1023, 197 P 304, 198 P 244; 53 CJS 843, Liens § 4; 1 Jones on Liens (3d ed) § 48.

An exception to this rule has been recognized by some courts in the case of a contract under which one party is to receive compensation for services out of a particular fund, if and when realized, where the fund is created in whole or in part by the efforts of the promisee. 53 CJS, id.; *Ingersoll v. Coram*, 211 US 335, 29 S Ct 92, 53 L ed 208; *Barnes v. Alexander*, 232 US 117, 34 S Ct 276, 58 L ed 530; *Geddes v. Reeves Coal & Dock Co.*, 20 F2d 48 (8th Cir 1927), 54 ALR 282; *Underwood v. Phillips Petroleum Co.*, 155 F2d 372 (10th Cir 1946); *American Agency & Investment Co. v. Gregg*, 99 Colo 142, 6 P2d 1101; *Mitchell v. Bowman*, 123 F2d 445 (10th Cir 1941); *Clark v. Armstrong*, 180 Okla 514, 72 P2d 362. Cf. *Kuppenheimer & Co. v. Mornin*, 78 F2d 261 (8th Cir 1935), 101 ALR 75; *Jamison Coal & Coke Co. v. Goltra*, 143 F2d 889 (8th Cir 1944), 154 ALR 1191. But these are cases in which the fund created by the efforts of the claimant was the sole source of compensation.

It would be an unwarranted extension of this exception to say that Galloway's efforts produced the fund—the proceeds of the insurance policy in this case—, and it is, of course, clear that his right to collect compensation was not limited to the fund. He had Cornelison's personal obligation.

■■ The trial court seems to have based is decision largely on the rule exemplified by *Butson v. Misz*, 81 Or 607, 612, 160 P 530. The doctrine of that case is that, where a mortgagor or conditional purchaser agrees to insure the property for the benefit of the mortgagee or vendor and breaches the agreement by taking out the insurance in his own name, the agreement creates, upon loss, an equitable lien on the proceeds in favor of the mortgagee or vendor to the extent of his interest in the property. 4 Pomeroy, Equity Jurisprudence (5th ed) 709. This is the general rule. 92 ALR 559; 8 Couch, Cyc of Insurance Law, § 1936c; id., 1945 Cum Supp, Vol III, § 1936c. But this rule is applicable only where the mortgagee or conditional purchaser agrees to make the insurance payable to the mortgagee or conditional vendor. The right depends on an enforceable contract and its breach by failure to include the promisor in the policy as a beneficiary. 9 ALR2d 301; 1 Jones on Liens (3d ed) 76; 5 Appleman, Insurance Law and Practice 526-527. Equity will then treat the insurance as effected under the agreement and will give the mortgagee his equitable lien accordingly. *Nordyke & Marmon Co. v. Gery*, 112 Ind 535, 13 NE 683, 2 Am St Rep 219; *Kirkpatrick v. Great American Insurance Co.*, (Tex Civ App) 299 SW 943. The doctrine of equitable lien arising out of an express agreement is, as stated by Mr. Pomeroy in a frequently quoted passage, "clearly an application of the maxim, equity regards as done that which ought to be done." 4 Pomeroy, op cit, 697-698. See *Stone v. First National Bank of Tillamook*, supra, 100 Or at 556-557.

■ The record here discloses no agreement on the part of Cornelison to make the insurance payable to Galloway. The policy issued was payable only to Cor-

nelison and his wife, and Galloway was satisfied with that, as he testified. The only fair construction of the evidence is that Cornelison agreed to obtain a policy of insurance from the proceeds of which he would pay Galloway in the event that the house should be destroyed by fire. The case, therefore, does not fall within either of the exceptions heretofore discussed, but is governed by the rule that the mere agreement to pay a debt out of a particular fund does not give rise to an equitable lien. *Stone v. First National Bank of Tillamook*, supra, and other authorities above cited.

 As stated by Chief Justice BURNETT in the opinion on petition for rehearing in the *Stone* case (100 Or at 558):

"* * * It is not grounded on mere moral obligation or upon a supposed advantage which either of the contracting parties has lost by his mere inadvertence. The lien must be some hold upon the identical property in dispute and this in addition to the monetary obligation represented by the debt for which it is supposed to be security. The lien is ancillary to and separate from the debt itself. It must be more than a mere promise to pay out of some particular fund. Such a promise is of no more dignity or obligation than the original agreement to pay the debt itself."

 It has further been suggested that Galloway's claim may be sustained as an equitable lien arising by implication. The rule is thus stated in 53 CJS 844, Liens § 4:

"An equitable lien may arise by implication from the conduct and dealings of the parties out of general considerations of right and justice, as, for example, in the case of property unlawfully appropriated or the payment of another's debt. There must however, be some ground for the intervention of equity, such as the absence of an adequate remedy at law."

But, as the section from which the foregoing quotation is taken shows, such a lien will not be implied where the parties themselves have, as here, stipulated for a purely legal liability. See *Mihan v. Great Western Sugar Co.*, 121 Neb 109, 236 NW 172. For that and other reasons not necessary to be stated we think that the rule invoked has no application to the facts of this case.

It results that the defendant Galloway's claim to an equitable lien upon the insurance fund must be disallowed and the claim of the defendants Palmer as attaching creditors allowed. That portion of the decree sustaining the homestead exemption claim of the defendant Mary A. Cornelison is affirmed. No costs or disbursements will be allowed.

Modified.