Argued June 19, reversed July 21, reconsideration denied
August 20, petition for review denied September 16, 1975

IN THE MATTER OF THE ESTATE OF ALFRED L. GUERBER,
DECEASED.

ROCHE, *Appellant, v.* GUERBER (No. 5801),
*Respondent.*

537 P2d 1177

*Edward L. Daniels,* Albany, argued the cause for appellant. On the briefs were C. S. Emmons and Emmons, Kyle, Kropp & Kryger, Albany.

*Robert Mix,* Corvallis, argued the cause and filed the brief for respondent.

Before SCHWAB, Chief Judge, and LANGTRY and FORT, Judges.

FORT, J.

In this probate proceeding, J. Richard Guerber, the respondent and personal representative of the estate of Alfred L. Guerber, allowed what is conceded to have been preferential treatment for a claim against the estate consisting of certain loans made to the decedent by Citizens Bank of Corvallis. Fern Roche, hereinafter referred to as the claimant, an unsecured creditor of the decedent, filed objections to the final account of the personal representative contesting such preferential treatment. The trial court disallowed claimant's objections on the sole ground that the respondent correctly concluded that the bank held an equitable lien for repayment of the loans upon the proceeds derived by the estate from its sale both of livestock and a pickup truck owned by decedent and thus was entitled to preferred status. Claimant appeals from the resulting order.

Richard Guerber and his father, Alfred Guerber, the decedent, had been equal partners in a business whereby the father purchased cattle, the son fed them, and they then sold them. By arrangement of long standing, Citizens Bank of Corvallis periodically loaned Alfred Guerber funds for the purchase of the cattle. These loans were clearly denominated "unsecured" on bank records. It was not until early 1969 that the son was required to cosign the notes. It is

conceded that no mortgage or other security instrument was ever given for any of these loans. All such money was advanced on the basis of notes clearly denominated by the bank as unsecured. A typical entry in the bank records reads:

"3/1/66

We, this date, made Mr. Alfred L. Guerber an additional loan in the amount of $800.00 for a period of 90 days. These funds are to assist him in the purchase of cattle and repayment will come from the sale of cattle.

| Total Line Now: | |
|---|---|
| Com'l Unsec. 8% | $800.00 |
| Com'l Unsec. (5 notes) 7% | 10,200.00 |
| | $11,000.00 IMS" |

When the cattle were sold, the proceeds were applied to the bank loans, retaining any excess for other joint expenses and as profits.

On June 16, 1969, Citizens Bank made an additional loan personally to Mr. and Mrs. Alfred Guerber in the amount of $2,450. The bank records referred to the note as unsecured, and recited,

"* * * These funds are to assist the subjects in the purchase of a 1969 Chev Pickup. Repayment will come from cattle sales, rentals, investments and estate proceeds. * * *"

Richard Guerber did not cosign this note.

Alfred Guerber died on July 29, 1969. Thereafter, Richard Guerber, on behalf of the estate, sold the pickup truck for $2,200 to the dealer from which it had been purchased. The check was turned over to the bank and by it applied to the $2,450 note signed the preceding June. The deficit of $250 was absorbed into the outstanding balance on the loans made to the Guerbers, previously mentioned.

Ira Stauss, Vice President of the Citizens Bank, testified as follows:

"Q   When you loaned 2,000, or when Citizens Bank loaned $2,450 for the purchase of the pickup, this was an unsecured note?

"A   Yes.

"Q   You didn't take the title or anything?

"A   No.

"Q   was the idea that it would be paid out of the sale of the cattle also?

"A   Yes.

"* * * * *

"Q   Would you expect him to pay the bank back this money out of dividends on the stocks and rentals as well as cattle sales?

"A   Yes.

"Q   Did you feel you had a lien on the rental payments and stock dividends?

"A   No.

"Q   Did you feel that you had a lien on the cattle sales?

"A   We had no lien, but our loans were based on the repayment from the cattle sales.

"Q   Weren't your loans based on past conduct, past repayments?

"A   He always paid all his notes from cattle sales.

"Q   You wouldn't have objected if he paid these amounts from some other source, would you?

"A   Right, I wouldn't have cared.

"Q   And if he, on the sly, sold the cattle or they were stolen, you would have to look to some other source for repayment?

"A   Well, if they were not paid from cattle sales and they—he had not the funds, his financial

statement was great enough that we felt we were protected. We would have been given a mortgage on their property, which was free and clear, or some nature of that as a workout.

"Q Okay. So you weren't looking just totally to the cattle sales, there was other things too of securing this note as well?

"A That's true, that's why the loan was granted. His financial statement warranted the loans."

Mr. Stauss further testified:

"For the records, we have in file Lila Guerber, that's Mrs. Guerber, that's A. L. Guerber, her personal guarantee for $25,000."

On this record, the trial judge in his memorandum opinion found that:

"* * * the money was loaned by the Citizens Bank for the specific purpose of feeding out certain identifiable cattle and the purchase of a pickup truck, and that *it was the expressed intention of the parties that the cattle and pickup were security for the loan.* These facts give rise to an equitable lien for the loan on the cattle and pickup." (Emphasis added.)

Pomeroy describes the doctrine of equitable liens in the context of express contracts as follows:

"The doctrine may be stated in its most general form, that every express executory agreement in writing, whereby contracting party sufficiently indicates an intention to make some particular property, real or personal, or fund, therein described or identified, a security for a debt or obligation * * * creates an equitable lien upon the property so indicated * * * Under like circumstances, a mere verbal agreement may create a similar lien upon personal property * * * [T]he doctrine itself is clearly an application of the maxim, equity regards as done that which ought to be done.

"* * * In order, however, that a lien may arise in pursuance of this doctrine, *the agreement* must deal with some particular property, either by identifying it, or by so describing it that it can be identified, and *must indicate with sufficient clearness an intent that the property* so described, or rendered capable of identification, *is to be held, given, or transferred as security for the obligation.*" 4 Pomeroy, Equity Jurisprudence 696-698, (5th ed.)

In *Stone v. First National Bank,* 100 Or 528, 193 P 1023, 197 P 304, 198 P 244 (1921), the Oregon Supreme Court quoted the foregoing passage and stated:

"* * * It is said that the doctrine is an application of the maxim that [equity] regards that as done which ought to be done. In respect to this last observation, that which ought to be done is that which the parties contracted to do but have not done. It is not grounded on mere moral obligation or upon a supposed advantage which either of the contracting parties has lost by his mere inadvertence. The lien must be some hold upon the identical property in dispute and this in addition to the monetary obligation represented by the debt for which it is supposed to be security. The lien is ancillary to and separate from the debt itself. It must be more than a mere promise to pay out of some particular fund. Such a promise is of no more dignity or obligation than the original agreement to pay the debt itself." 100 Or at 557-58.

In *Oregon Mutual Ins. v. Cornelison et al,* 214 Or 501, 330 P2d 161 (1958), a building contractor sought to assert an equitable lien on fire insurance policy proceeds which had been paid to the now-bankrupt owner. The evidence showed that, at the contractor's insistence, the owner had agreed to obtain a fire insurance policy, the proceeds of which would be paid to the contractor in case the structure was destroyed by fire. The policy was made payable only to the owner,

an arrangement deemed satisfactory by the contractor. Holding that no equitable lien on the insurance proceeds could be recognized, the court declared:

> "It is settled law that a mere promise to pay a debt out of a particular fund is not sufficient to create an equitable lien on the fund even though the fund was created through the effort and outlays of the party claiming the lien. *Stone v. First National Bank of Tillamook,* 100 Or 528, 550, 558, 193 P 1023, 197 P 304, 198 P 244; 53 CJS 843, Liens § 4; 1 Jones on Liens (3d ed) § 48." 214 Or at 509.

■ In the case at bar, it was at best an intent of the parties that the bank be paid from the funds, if any, derived from the sale of the cattle as well as from any other sources available to the debtors. It is not contended that the agreement reserved any right in the bank to the possession or control of either the livestock or the pickup truck. We conclude no equitable lien arose.

Respondent relies on *Dufur Oil Company v. Enos,* 59 Or 528, 117 P 457 (1911), as the principal authority in support of his claim. We note first that this case was not referred to in *Stone* or *Oregon Mutual.* In *Dufur,* an oil company successfully asserted an equitable lien over specific machinery in the possession of a drilling company. The oil company had contracted with the drilling company for the latter to sink a well for the former and to advance money for the purchase of necessary equipment for that specific purpose. The owner of the drilling company was cross-examined as to the circumstances surrounding that contract as follows:

> " 'Q. You understood, and everybody else understood, that they [the machinery] were held as security for the $2,500 advanced?'
> " 'A. Yes; that was the understanding, and considered a part of it.' " 59 Or at 534.

The court concluded that the contract between the parties

> "* * * was intended to charge particular property with the payment of a debt to be created by advances made to enable Enos to secure the necessary machinery with which he could perform the work undertaken. An equitable lien was thus expressly contemplated by the parties * * *." 59 Or at 533.

In the case at bar, it is clear from the bank's own records and testimony that it was the intention of the parties that the various loans to the decedent were unsecured. We think this case is clearly distinguishable from *Dufur* and is governed by the principles announced in *Stone* and *Oregon Mutual*.

Finally, respondent argues that we should, in any event, recognize an equitable lien outside the contract. He cites *Oregon Mutual Ins. v. Cornelison et al,* supra, wherein the Supreme Court quoted from 53 CJS 836, 844, Liens § 4 as follows:

> " 'An equitable lien may arise by implication from the conduct and dealings of the parties out of general considerations of right and justice, as, for example, in the case of property unlawfully appropriated or the payment of another's debt. There must however, be some ground for the intervention of equity, such as the absence of an adequate remedy at law.' " 214 Or at 511.

■ The section of CJS from which the foregoing quotation was taken continues as follows:

> "* * * However, the tendency is to limit rather than extend the doctrine of constructive liens, and, in order that such a lien may be claimed, either the aid of a court of equity must be requisite to the owner so that he can be compelled to do equity or there must be some element of fraud in the matter as a ground of equitable relief. Such a lien will

not be implied and enforced where the facts and circumstances present no grounds for equitable relief, and there is an adequate remedy at law, as where the parties themselves have stipulated for a purely legal liability. * * *" 53 CJS 836, 844-45, Liens, § 4.

On the facts of this case, wherein the Guerbers and the bank clearly agreed that the notes were unsecured and where the respondent has shown no other claim cognizable in equity, we find the doctrine of constructive liens inapplicable. *See Oregon Mutual Ins. v. Cornelison et al,* supra, 214 Or at 512.

Since we have concluded that the judgment of the trial court must be reversed, we do not reach the claim of respondent for attorney's fees.

Reversed.