GARY E. MONEGAN, ET AL, *Respondents*, v. PACIFIC NATIONAL BANK OF WASHINGTON, ET AL, *Respondents*, RAY B. CORRIGAN, *Appellant*.

*Marvin B. Durning, J. M. Richardson,* and *Durning, Smith & Brucker,* for appellant.

*Ken Burrows* and *Comfort, Dolack, Hansler & Hulscher,* for respondents.

REED, J.—Ray B. Corrigan appeals from a Pierce County Superior Court judgment in an interpleader suit which held his judgment lien on the impounded funds inferior to the interest of Pacific National Bank of Washington. We affirm in part and reverse in part.

In 1967, W. H. Ostruske, his son, W. T. Ostruske, and two other parties acquired a tract of land near Tacoma, Washington, as tenants in common, each owning an undivided one-fourth interest. In 1968 the property was sold on contract to Professional Investors Company, a partnership. Installment payments on the contract were to be paid to cotenant, Jack Baty, as agent for all, who was to forward his personal check for one-fourth of the payment to each tenant.

In 1970 the Ostruskes decided to dissolve their father-son partnership venture known as Sound Enterprises. The land contract in question was not an asset of Sound Enterprises; however, after conveying all his interest in the partnership assets to his father as "continuing partner," the son remained indebted to the venture, and to settle accounts, on March 15, 1970, he executed a promissory note to his father in an amount equal to his one-fourth interest in the unpaid balance of that contract. Thereafter, on April 12, 1970, the son executed the following agreement:

> I, W. T. Ostruske, agree to sign over my one quarter (¼) interest in a real estate contract to Sound Enterprises to repay all drawings made by me (W. T. Ostruske) during 1968-1969 and 1970.

The senior Ostruske sent a copy of this agreement to Baty, asking him to forward the son's share of all future contract payments to the father at his home address. At or about this time the younger Ostruske sought legal and tax advice regarding the dissolution of Sound Enterprises and the assignment of his interest in the contract. He was told that an outright assignment to his father would accelerate into the current year a deferred income tax gain which he

had been reporting on the installment basis. Because of this advice, on May 5, 1970, the Ostruskes executed a written agreement dissolving Sound Enterprises and providing in part as follows:

> As further consideration for the drawings allowed to the Retiring Partner from the partnership, as mentioned in the preceding paragraph, and for retirement of other indebtedness owed to the Continuing Partner, the Retiring Partner agrees to execute a promissory note to the Continuing Partner in the sum of $31,089.94, which is the amount of his one-quarter interest in a Contract of Sale of Real Estate to Professional Investors Company, a partnership, as of March 18, 1970, a copy of which Contract is marked Exhibit "A," attached hereto and made a part hereof by this reference. IT IS AGREED that the aforesaid indebtedness shall be paid by the Retiring Partner to the Continuing Partner *by payments of all amounts received by the Retiring Partner under said Real Estate Contract as the payments are received from the purchasers thereunder.*

(Italics ours.) On that same date the father wrote to Baty telling him to "totally ignore and disregard" the previous instructions regarding an assignment of the son's interest. Thereafter the son continued to receive from Baty his share of the contract payments. As each payment was received he would endorse the check and mail it to his father to be applied against the note. This continued until May 1972 when competing claims to the contract payments first surfaced. On March 24, 1972, the original contract sellers, including the younger Ostruske, agreed to accept reduced payments from Professional Investors.

On January 25, 1971, the senior Ostruske executed a deed and seller's assignment of his interest in the contract to Pacific National Bank of Washington (hereafter called the Bank), as security only, for an indebtedness of $236,000. At the same time and as additional security therefore, the father executed a deed of trust to certain other of his properties. The assignment made no mention of the extent of the assignor's interest in the contract but recited a contract balance of $58,000; the testimony established this

figure as being one-half of the balance then remaining and that the father intended to transfer both his and his son's interest.

On January 28, 1972, Ray B. Corrigan (hereafter Corrigan), obtained judgments in the federal district court against both Ostruskes and these judgments were recorded in Pierce County on March 6, 1972. Apparently prompted by notice of these filings, the Bank initiated efforts to have all further payments on the Ostruskes' interests made to it. In June 1972, at the instance of the Bank, the elder Ostruske signed a written acknowledgment that he had assigned his interest in the contract to the Bank and agreed to submit to a nonjudicial foreclosure of the deed of trust. In exchange, he received a credit of $53,000 (one-half contract balance) on his debt and was relieved of any claim to a deficiency on the sale.

Corrigan claimed priority over the Bank's interest and this prompted Professional Investors to initiate this interpleader suit; the funds were sequestered in the superior court registry and the parties entered into a stipulation as follows:

> By stipulation and agreement among CORRIGAN, OSTRUSKES, PACIFIC NATIONAL BANK OF WASHINGTON and Plaintiffs, this action has been expanded to include all claims these parties have against each other as to past, present and future payments under the Professional Investors Company real estate contract or the land it covers, and that no further execution, foreclosure, or similar actions will be required.

During the trial in Superior Court both Ostruskes and their attorney testified it was their intent that the agreement of May 1970 constitute a present assignment of the son's interest in future contract payments to the father. After hearing all the evidence the trial court made and entered the following disputed findings of fact:

IV

That on May 5, 1970 W. H. OSTRUSKE and W. T. OSTRUSKE with their respective spouses entered into a formal dissolution agreement which was signed and ac-

knowledged and said agreement incorporated the real estate contract dated September 20, 1968. That it was intended by the parties that all rights of W. T. OSTRUSKE, et ux, under the real estate contract were assigned and transferred to the father W. H. OSTRUSKE, and there was valuable consideration for such assignment and transfer.

### V

That since May 5, 1970, although checks may have been received by W. T. OSTRUSKE, all monies were paid over to W. H. OSTRUSKE or were received by PACIFIC NATIONAL BANK OF WASHINGTON for credit to the account of W. H. OSTRUSKE. W. T. OSTRUSKE, since May, 1970 has never retained any of his one-fourth payments under the real estate contract, and there was a complete appropriation of those payments by W. H. OTRUSKE, and a relinquishment of control over those payments, or the use to which they are to be made, by W. T. OSTRUSKE.

### X

On June 5, 1972 W. H. OSTRUSKE and GURTHIA OSTRUSKE made an agreement with PACIFIC NATIONAL BANK OF WASHINGTON to outright assign the balance of all contract payments under the Plaintiffs' real estate contract dated September 20, 1968 of a one-half interest of all OSTRUSKES in said real estate contract. The one-half interest at that time was $53,000.00 PACIFIC NATIONAL BANK OF WASHINGTON credited the $236,000.00 Promissory Note with a payment of $53,000.00. PACIFIC NATIONAL BANK OF WASHINGTON then foreclosed by Non Judicial Deed of Trust Sale certain real properties located in Pierce County, Washington as a result of which the balance of the $236,000.00 Promissory Note plus interest and costs was satisfied in full.

### XIII

The Ostruskes have bare legal title only to the real property involved in the real estate contract with the Plaintiffs, and the entire one-half Ostruske's interest has been equitably assigned to PACIFIC NATIONAL BANK OF WASHINGTON.

Corrigan assigns error to these findings of fact and to the court's conclusion of law No. 4 that the Bank was entitled to all of the funds then on deposit and all future payments to be made under the contract.

At the outset, we note the parties are really not

in disagreement over the nature of the interest which the vendors had in the real estate sold to Professional Investors at the time Corrigan's judgment liens attached on March 6, 1972. Such liens attach only to such right, title, and interest as the judgment debtor then has as seller of the property and no more. *Heath v. Dodson*, 7 Wn.2d 667, 110 P.2d 845 (1941). Where a judgment debtor has already entered into a valid contract of sale, he holds title subject to the equitable right of the vendee to a fulfillment conveyance; any levy and sale under a judgment lien subsequently attaching would simply place the purchaser in the debtor's shoes and he could acquire no greater or better title. *Heath v. Dodson, supra.*

A judgment debtor's right to contract payments is separate and distinct from his interest in the land as such but the balance remaining unpaid on a contract will measure his beneficial interest in the property. *Meltzer v. Wendell-West*, 7 Wn. App. 90, 497 P.2d 1348 (1972). To the extent other interests have not intervened, the judgment creditor, in effect, levies upon the contract balance. The vendor's right to contract payments is subject to assignment separately from his interest in the land and a valid prior assignment of that interest, even though equitable in nature, has priority over a subsequently attaching lien. The vendor's interest in such case would consist only of "the naked legal title to the property, in trust first for the assignee of the contract, and second for the vendees in the contract in case they performed it." *Heath v. Dodson, supra* at 672; *see also Meltzer v. Wendell-West, supra,* and *Culmback v. Stevens,* 158 Wash. 675, 291 P. 705 (1930).

### EQUITABLE ASSIGNMENT

Because the younger Ostruske never did execute an express assignment of his interest, as evidently contemplated by the agreement of April 12, 1970, the questions before us may be stated as follows: (1) Is there substantial evidence to support the trial court's specific findings of complete appropriation and relinquishment of control, and (2) Is there support for the trial court's legal conclusion of equi-

table assignment, with resulting priority over Corrigan's subsequently filed judgment liens? We think not.

As stated in *Mercantile Ins. Co. of America v. Jackson*, 40 Wn.2d 233, 236, 242 P.2d 503 (1952):

> It is a well-settled proposition that an equitable assignment, prior in point of time, prevails over a subsequent garnishment. . . . We have recognized this rule on numerous occasions. *Heermans v. Blakeslee*, 97 Wash. 647, 167 Pac. 128.
>
> In order to accomplish an effective equitable assignment, an assignor must have intended to transfer a present interest in the debt or fund and, pursuant to such intention, must have made an absolute appropriation of the thing assigned, relinquishing all control or power of revocation over it to the use of the assignee. *Nickerson v. Hollet*, 149 Wash. 646, 272 Pac. 53; *Sneesby v. Livington*, 182 Wash. 229, 46 P. (2d) 733; 4 Am. Jur. 288, Assignments, § 76.

(Citations omitted.) And, as it was put so many years ago in *Christmas v. Russell*, 81 U.S. (14 Wall.) 69, 84, 20 L. Ed. 762, 764 (1872):

> The phraseology employed is not material provided the intent to transfer is manifested. Such an intent and its execution are indispensable. The assignor must not retain any control over the fund—any authority to collect, or any power of revocation. If he do, it is fatal to the claim of the assignee. The transfer must be of such a character that the fund-holder can safely pay, and is compellable to do so, though forbidden by the assignor.

In the instant case, while the original intention of the Ostruskes was to enter into an outright assignment, that intention underwent a change when it was learned there would be adverse tax consequences. Accordingly, it was agreed the son would continue to receive the contract payments; in fact, he did so for 2 years and until after the filing of Corrigan's judgment liens. In addition, the younger Ostruske's joinder in permitting reduced payments is inconsistent with an appropriation. Even though the son honored his agreement with his father by endorsement of the checks, at no time was Professional Investors placed in peril by continuing to make payments to the son; at no time

could the father have demanded payment from Professional Investors. The son retained the power to control both receipt and disposition; he had not relinquished control. There was thus no evidence of an actual appropriation as found by the trial court.

In essence then, the son merely promised to pay his father as, if, and when a particular fund came into existence. Such a promise will not support a finding of equitable assignment. *Oregon Mut. Ins. Co. v. Cornelison,* 214 Ore. 501, 330 P.2d 161 (1958); *Hossack v. Graham,* 20 Wash. 184, 55 P. 36 (1898); *Trist v. Child,* 88 U.S. (21 Wall.) 441, 22 L. Ed. 623 (1875); *Christmas v. Russell, supra; Wright v. Ellison,* 68 U.S. (1 Wall.) 16, 17 L. Ed. 555 (1864); 4 S. Symons, *A Treatise on Equity Jurisprudence* § 1283(a) (5th ed. 1941); 6 Am. Jur. 2d *Assignments* § 88 (1963).

## EQUITABLE LIEN

■ Nor do we think the transaction gave rise to an equitable lien which could have been enforced by the father or transferred to the Bank so as to take precedence over Corrigan's judgment liens. While no particular form is required to give rise to an equitable lien, the parties must have intended to impress a particular fund or thing with a charge *as security for an underlying debt or obligation.* 4 S. Symons, *A Treatise on Equity Jurisprudence* § 1235 (5th ed. 1941). 51 Am. Jur. 2d *Liens* § 66 (1970). Equitable liens create no estate or property in the thing to which they attach; they provide no basis for a possessory action either against the debtor or his obligor or fundholder, as in the case of a perfected assignment. Under the doctrine of equitable lien, the debtor retains both title and the right to possession until court action is taken to subject the security to payment of the debt it secures. As stated in *Nelson v. Nelson Neal Lumber Co.,* 171 Wash. 55, 61, 17 P.2d 626 (1932), paraphrasing 4 S. Symons, *A Treatise on Equity Jurisprudence* § 1233, at 692 (5th ed. 1941):

> "An equitable lien is the right to have property subjected in a court of equity to the payment of a claim. . . . It is neither a debt nor a right of property but a remedy for a debt. It is simply a right of a special nature

over the property which constitutes a charge or incumbrance thereon, so that the very property itself may be proceeded against in an equitable action and either sold or sequestered under a judicial decree and its proceeds in one case, or its rents and profits in the other, applied upon the demand of the creditor in whose favor the lien exists."

(Citations omitted.) *See also American Sav. Bank & Trust Co. v. Lawrence*, 114 Wash. 198, 194 P. 971 (1921).

■ Equitable liens, like equitable assignments, require more than a mere promise to pay out of a special source or fund. *Oregon Mut. Ins. Co. v. Cornelison, supra; Hossack v. Graham, supra.* As stated in the *Cornelison* case at page 511:

> The lien must be some hold upon the identical property in dispute and this in addition to the monetary obligation represented by the debt for which it is supposed to be security. The lien is ancillary to and separate from the debt itself. It must be more than a mere promise to pay out of some particular fund. Such a promise is of no more dignity or obligation than the original agreement to pay the debt itself."

On the record it appears the Ostruskes compromised the son's debt to the partnership. The essence of their agreement was that the father would accept in full satisfaction of all claims such sums as the son would ultimately receive from the Professional Investors' contract; this was evidenced by the promissory note which was drawn in the exact amount of the unpaid balance. The son's real obligation was simply, as the son put it, "I agreed to send equal payments to my father each time I received a payment;" both testified they intended no obligation unless and until a payment was received. The son could default only by failing to remit *after receipt.* Failure of Professional Investors to pay would not constitute a default by the son. Thus, the contract payments were the only indebtedness; they did not *secure* a separate debt of the son, but merely provided a special source from which he promised to pay. Neither expressly nor by implication did the parties impress a charge or lien

on the son's *right to receive* the payments to secure the son's debt—a debt which arose only after receipt. Thus any attempt to uphold the trial court's judgment on the basis of equitable lien must also fail. The Corrigan judgment liens therefore attached to the son's unencumbered *right to receive* the contract payments.

Corrigan also urges that the Bank's nonjudicial foreclosure under the deed of trust somehow extinguished its claim to the father's interest in the contract. We are cited to RCW 61.24.100 (Washington deeds of trust act) which prohibits recovery of a deficiency after nonjudicial sale of a security, but these provisions were designed to protect the debtor and Corrigan has no standing to complain of an action fully acceded to by the father. In any event, the Bank had already accepted an "outright" assignment in lieu of foreclosure on the father's interest and given credit therefore upon the total debt prior to foreclosing the deed of trust. Corrigan's argument appears to be one of "marshaling the assets" to require the Bank to first take recourse against the property in which he has no interest before proceeding against that in which he does claim an interest. We fail to see how such a claim, even if well-founded at some stage of the proceedings, could successfully be asserted after the sale is an accomplished fact. The Bank's claim to the father's interest is superior to that of the Corrigan judgments.[1]

The judgment of the trial court is affirmed as to the Bank's priority on the father's interest and reversed as to the son's interest, and the cause is remanded for further proceedings consistent herewith.

PETRIE, C.J., and PEARSON, J., concur.

---

[1] The stipulaton, *supra*, was apparently intended to obviate any problems arising from the fact Corrigan took no action to execute on his judgments by sale of the vendor's residual interest. So, too, the stipulation would obviate any need to foreclose against the son's interest if we were to hold the Bank held merely an equitable lien (security) instead of an interest by assignment.